UNITED KLANS OF AMERICA and Knights of the Ku Klux Klan, Inc., Plaintiffs,

v.

James L. McGOVERN, former special agent in charge Birmingham Office of the Federal Bureau of Investigation, Clarence M. Kelley, Individually, and in his capacity as director of the Federal Bureau of Investigation and custodian of their records, et al., Defendants.

Civ. A. No. 77–G–1160–W.

United States District Court, N. D. Alabama, W. D.

June 30, 1978.

John E. Mays, Mobile, Ala., for plaintiffs.

Barbara Allen Babcock, Asst. Atty. Gen., Dept. of Justice, Washington, D. C., J. R. Brooks, U. S. Atty., Henry I. Frohsin, Asst. U. S. Atty., Birmingham, Ala., Barbara B. O'Malley, and Edward S. Christenbury, Attys., Dept. of Justice, Washington, D. C., for defendants.

## MEMORANDUM OPINION

GUIN, District Judge.

This matter is before the court on defendants' motion to dismiss or in the alternative for summary judgment. After careful consideration of the motion, briefs, affidavits, arguments of counsel, and applicable law, this court is of the opinion that there is no genuine issue as to any material fact, that the moving parties are entitled to judgment as a matter of law, and that there is no just reason for delay in issuing a final judgment.

In its complaint, the plaintiff corporation has alleged that in 1964 the then-director of the F.B.I. instituted a counterintelligence program (COINTELPRO) designed to expose, disrupt and otherwise neutralize the Ku Klux Klan and other hate groups and that such program continued in effect until 1972. The plaintiff has further alleged that the purpose of the counterintelligence program was to cause resignations, annoy members of plaintiff corporation, prevent the acquiring of new members, and destroy the financial structure and sources of plaintiff corporation in violation of its first, fourth and fifth amendment rights. Specifically, plaintiff alleges that in implementing this program certain officials of the F.B.I., *inter alia*:

(1) used informants to infiltrate plaintiff corporation and create internal conflicts within the organization;

(2) anonymously mailed information derogatory to plaintiff corporation, its leaders and members, to persons in the news media and to private individuals;

(3) reviewed the income tax returns of selected members of the plaintiff corporation;

(4) contacted creditors of certain plaintiff corporation members to encourage them to require prompt payment from such members;

(5) anonymously mailed cartoon and caricature postcards to officers and members of plaintiff corporation, ridiculing plaintiff corporation;

(6) forged the signature of corporation leader Robert M. Shelton on purported plaintiff corporation literature; and

(7) established an opposing organization for the purpose of disrupting plaintiff corporation's activities.

Plaintiff has alleged that the aforementioned activities were implemented by the F.B.I. through telephone taps, burglaries, mass openings of mail, and forgery.

On November 18, 1974, the then-Attorney General of the United States, William B. Saxbe, and then Director of the F.B.I., Clarence M. Kelley, issued detailed statements, with an accompanying press release, describing with specificity the counterintelligence program of the F.B.I. (COINTELPRO) and identifying and discussing the targets of the program and the types of activities directed at such individuals and organizations. Specifically, beginning in 1956 and continuing until 1971, seven separate counterintelligence programs were implemented against various foreign and domestic subversive groups. These seven target groups included the Communist Party, U.S.A. (1956–1971); Socialist Workers Party (1961–1970); white hate groups (1964–1971); black extremists (1967–1971); New

Left (1968–1971); espionage or Soviet satellite intelligence (1964–1971); and special operations (1967–1971).

Several questions are before the court at this time.

1. Was the United Klans of America, Knights of the Ku Klux Klan, Inc., regarded as a "white hate group" pursuant to the F.B.I.'s counterintelligence program?

2. If the United Klans was regarded as a white hate group, did the plaintiff have knowledge, or should it have had knowledge, of COINTELPRO on or about November 18, 1974, the date of the press conference of then-Attorney General William B. Saxbe?

3. If the plaintiff knew, or should have known, of COINTELPRO as of November 1974, have all applicable statutes of limitations run against the plaintiff corporation?

Plaintiff has stated, in arguments to the court, that the United Klans is not a so-called "white hate group" and has offered Mr. Robert Shelton's affidavit, dated March 24, 1978, in support of that contention. Mr. Shelton's affidavit, in part, states that he has "never enunciated a policy calling upon white citizens or members of the plaintiff corporation to hate Negro citizens [or] . . . to hate Jewish or Semitic citizens." Affiant further states that there are approximately 30 such Klan groups throughout the United States and if such a policy had been adopted by the Klans, Shelton himself would have had to approve such a policy.[1]

■ The court takes issue with Mr. Shelton's affidavit. In the Report by the Committee on Un-American Activities, House of Representatives, entitled "Present-Day Ku Klux Klan Movement," release date December 11, 1967, of which this court takes judicial notice, Mr. Shelton made several statements which are contra to his affidavit. Page 81 of this report contains material which exemplifies Mr. Shelton's contempt for black and Jewish citizens. Specifically, in a speech at a United Klans rally in North

---

1. The court had previously ruled that it would not consider plaintiff's affidavits filed March 24, 1970, due to the fact that they were untimely filed. The court reverses that decision and has considered all affidavits previously filed by plaintiff.

Carolina on October 28, 1961, Mr. Shelton stated:

> We are one Klan in our unchangeable determination that these United States will be saved from destruction under this foul combination of Negro-Jewish communism. Yes, our mortal enemy, as of old is the jungle descendant of the Negro, but today he has banded together with the non-white, money-drunk, anti-Christian Jew who has influenced him, financed him, propagandized him, defended him falsely in our courts and enslaved him into his Jewish-owned and controlled NAACP.

Therefore, the court is of the opinion that the United Klans of America, Inc., and specifically Robert Shelton, had enunciated a policy for members of plaintiff corporation to hate Negro and Jewish citizens, and the court specifically determines that the United Klans is a "white hate" organization.

Alternatively, the court makes this determination pursuant to Rule 201 of the Federal Rules of Evidence which, in pertinent part, states that the court can take judicial notice of a fact "generally known within the territorial jurisdiction of the trial court or . . . capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." The United Klans has been and continues to be a "white supremacy" organization whose purposes and policies are implemented by acts of terror and intimidation. *U. S. v. Crenshaw County Unit of the United Klans of America*, 290 F.Supp. 181 (M.D.Ala.1968), footnote 2; *U. S. v. Original Knights of the KKK*, 250 F.Supp. 330 (E.D.La.1965). "This court would not hesitate to judicially notice the historical reputation of the Klan as a whole concerning its purposes and methods." *U. S. v. Crenshaw County Unit of the United Klans of America, supra*, footnote 1.

It is plain and generally publicly known within this district that said organization is a white hate group. The court judicially notices this fact.

The second issue before the court is whether plaintiff had sufficient knowledge, or should have had sufficient knowledge, of the counterintelligence programs, as of November 18, 1974, the date of Attorney General Saxbe's press conference. Plaintiff has taken the position that United Klans had no knowledge of COINTELPRO prior to receiving documents from the Department of Justice in October 1976. Although October 1976 might have been the date that plaintiff received actual knowledge of the F.B. I.'s counterintelligence programs, the court can reasonably conclude plaintiff had, or should have had, in the exercise of reasonable diligence, notice of the programs on or about November 18, 1974.

The November 18, 1974, press conference of then-Attorney General Saxbe was attended by representatives of all three networks, wire services, and many of the leading newspapers throughout the country.[2] The gist of the news conference was also reported on a local basis, with both The Birmingham News and The Birmingham Post-Herald carrying articles in their November 19, 1974, editions. Moreover, the article in The Birmingham Post-Herald specifically mentioned the Ku Klux Klan as a white hate group.

Having addressed the questions of whether the Ku Klux Klan was regarded as a white hate group and whether the Ku Klux Klan had or should have had knowledge of the counterintelligence programs, the court is of the opinion that this action is barred by the statute of limitations.

The law is now settled that where the federal right sued upon—here, the Constitution—does not prescribe a period of enforcement, the federal courts will look to the applicable law of the state in which the court sits to determine the appropriate statute of limitations; the applicable period of limitation being that which the state itself would enforce had an action seeking similar relief been brought in a court of that state. *Johnson v. Railway Express Agency*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295

---

**2.** March 15, 1978, affidavit of Robert J. Havel, Deputy Director of the Office of Public Information, Department of Justice, Washington, D. C.

(1975); *United Auto Workers v. Hoosier Cardinal Corp.*, 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966); *Beard v. Stephens*, 372 F.2d 685 (5th Cir. 1967). In the present action the controlling Alabama statute of limitations is that prescribing that all actions for injury to the person or rights of another, not arising from contract, and not otherwise specifically enumerated, must be commenced within one year. Code of Alabama 1975, Section 6–2–39.

However, as the court observed in *Azalea Meats, Inc. v. Muscat*, 386 F.2d 5, 8 (5th Cir. 1967), "[i]n determining when the clock starts running for the purpose of applying a borrowed state statute of limitations to a federally created remedy, federal, not state, law is controlling." And this court concludes, as in *Pollard v. United States*, 384 F.Supp. 304, 307 (M.D.Ala.1974), that "[a]s a matter of federal law, the statute does not begin to run until the facts giving rise to the action are discovered or reasonably discoverable."

Thus, accepting, as we must, the equitable tolling doctrine recognized by this court and other federal courts, the plaintiff herein, by November 19, 1974, clearly had sufficient facts to commence the running of the one-year statute of limitations, and to require it to exercise due diligence to obtain any additional information it required to institute an action testing the propriety of the disclosed conduct. The plaintiff, having failed to commence this action within the prescribed time permitted by law, is hereby barred from proceeding with this action.

A separate order in conformity herewith will be entered.