UNITED KLANS OF AMERICA and
Knights of the Ku Klux Klan, Inc.,
Plaintiffs-Appellants,

v.

James L. McGOVERN, former special
agent in charge, Birmingham office of
Federal Bureau of Investigation, et al.,
Defendants-Appellees.

No. 78–3034.

United States Court of Appeals,
Fifth Circuit.

July 9, 1980.

John Edmond Mays, Decatur, Ala., for
plaintiffs-appellants.

J. R. Brooks, U.S. Atty., Henry I. Frohsin,
Asst. U.S. Atty., Birmingham, Ala., Edward
Christenberry, Robert E. Kopp, Katherine
S. Gruenheck, Patricia G. Reeves, U.S.

Dept. of Justice, Civil Div., App. Staff, Washington, D.C., for defendants-appellees.

Before THORNBERRY, ANDERSON and THOMAS A. CLARK, Circuit Judges.

PER CURIAM:

The United Klans of America, Knights of the Ku Klux Klan (hereinafter referred to as Klan or KKK), filed a complaint on August 26, 1977, against Clarence M. Kelley, individually and in his official capacity as Director of the Federal Bureau of Investigation, James L. McGovern, former special agent in charge of the Birmingham office of the FBI, and others (hereinafter collectively referred to as FBI). The complaint alleged violation of the Klan's First, Fourth and Fifth Amendment rights resulting from the FBI's counterintelligence program (COINTELPRO), which was designed to expose, disrupt and otherwise neutralize certain organizations, including the Klan. The district court, 453 F.Supp. 836, granted the FBI's motion for summary judgment, holding that the action was barred by the applicable Alabama one-year statute of limitations. The Klan appeals. We affirm.

■ There is no federal statute of limitations applicable to this constitutionally based civil suit. We therefore look to the

law of Alabama, the forum state, to determine the appropriate statute of limitations.[1] See, e. g., Johnson v. Railway Express Agency, Inc., 421 U.S. 454, 462, 95 S.Ct. 1716, 1721, 44 L.Ed.2d 295 (1975); McNeal v. Paine, Webber, Jackson & Curtis, Inc., 598 F.2d 888, 891 & n. 4 (5th Cir. 1979); Cox v. Stanton, 529 F.2d 47, 50 (4th Cir. 1975). The parties agree that the pertinent Alabama statute of limitations provides for a one-year limitations period. Ala. Code § 6–2–39(a)(5) (1975).[2] The COINTELPRO activities which form the basis of the Klan's complaint allegedly occurred between 1960 and 1972. The complaint was filed on August 26, 1977. Thus, unless the statute of limitations was somehow tolled at least until August 26, 1976, this action is barred. The Klan claims that the statute was tolled until October 13, 1976, the date it first received documents from the Department of Justice concerning COINTELPRO's KKK related activities.[3] Until then, the Klan contends, the FBI fraudulently concealed its cause of action.[4] We disagree.

■ Fraudulent concealment tolls the statute of limitations. To rely on this tolling doctrine, "plaintiff must show that the defendants concealed the conduct complained of, and that he failed, despite the exercise of due diligence on his part, to discover the facts that form the basis of his claim." In re Beef Industry Antitrust Litigation, 600 F.2d 1148, 1169 (5th Cir. 1979).[5]

---

1. Although we look to Alabama law for the appropriate statute of limitations, federal law controls the determination of when the cause of action accrues. E. g., Lavellee v. Listi, 611 F.2d 1129, 1130 (5th Cir. 1980); Azalea Meats, Inc. v. Muscat, 386 F.2d 5, 8 (5th Cir. 1967).

2. Ala.Code § 6–2–39(a)(5) applies to "Actions for any injury to the person or rights of another not arising from contracts and not [otherwise] specifically enumerated . . . ."

3. These documents were requested by Robert Shelton, president of the plaintiff corporation, on September 17, 1976.

4. The government concedes that the statute of limitations did not commence running in 1972, the year the Klan alleges that the FBI terminated its COINTELPRO operations against the Klan. However, the government argues that

tolling ended on November 18, 1974, when then Attorney General Saxbe held a press conference, see infra, disclosing the COINTELPRO program to the public. The government's position was adopted by the district court.

5. In the Beef Industry case, plaintiffs urged application of the fraudulent concealment doctrine to toll the statute of limitations. The district court rejected their plea and granted summary judgment for defendants. On appeal, we held that while plaintiffs knew or should have known of facts "calculated to excite inquiry," summary judgment was improper because there existed a genuine factual issue as to whether plaintiffs, through the exercise of due diligence, would have discovered adequate ground for filing suit. 600 F.2d at 1170–71. Beef Industry differs materially from the instant case. The facts in that case did not show

" 'Once plaintiff is on inquiry that it has a potential claim, the statute can start to run.' " *Prather v. Neva Paperbacks, Inc.,* 446 F.2d 338, 341 (5th Cir. 1971). In this case, a combination of factors lead us to conclude that in the exercise of due diligence, plaintiff should have known that it had a potential claim against the FBI prior to August 26, 1976.

First, on November 18, 1974, then Attorney General William Saxbe held a press conference at which he revealed the existence of the COINTELPRO program to the public. At the conference, Saxbe distributed a Department of Justice press release which indicated that "White Hate" groups were a target of the COINTELPRO program.[6] The release summarized the techniques used by COINTELPRO against White Hate groups,[7] techniques which the Department of Justice conceded, in some instances, to be "abhorrent in a free society." In oral remarks at the conference, Saxbe spoke specifically about FBI counter-

intelligence activities against the Klan. He said that some of these activities may have been improper.

The Attorney General's press conference was attended by the three major networks, the wire services, and many of the leading newspapers in the country. On the following day, November 19, 1974, articles reporting the substance of the press conference appeared in at least two newspapers with a circulation in the Northern District of Alabama, Western Division, where this suit was filed. One of these articles expressly named the KKK as a COINTELPRO target. Where events receive such widespread publicity, plaintiffs may be charged with knowledge of their occurrence. *See In re Beef Industry Antitrust Litigation,* 600 F.2d at 1169–71; *Smith v. Nixon,* 606 F.2d 1183, 1190 n. 42 (D.C.Cir.1979), *petition for cert. filed,* 48 U.S.L.W. 3404 (Dec. 7, 1979) (No. 79–882).

Second, the report of a United States Senate inquiry into the COINTELPRO pro-

that defendants ended their concealment of plaintiffs' claim prior to the commencement of the limitations period. Here, however, defendants have conclusively shown that more than one year before the Klan filed suit, the government lifted the veil of secrecy covering the COINTELPRO program. Unlike the situation in *Beef Industry,* it is clear that the Klan would have discovered evidence supporting their claim by the exercise of due diligence.

**6.** The press release did not name the organizations regarded by the FBI as "White Hate" groups. The district court took judicial notice that the Klan was such a group; accordingly, the court held that the Klan should have known that it was a COINTELPRO target. We find it unnecessary to reach the matter of judicial notice in order to charge the Klan with knowledge that it was a COINTELPRO target. As discussed in the text below, during the press conference, Attorney General Saxbe specifically referred to the Klan in discussing COINTELPRO's activities; a Senate report published in April, 1976, not only stated that the Klan was a target of COINTELPRO, it described in detail many of the most disruptive activities employed by COINTELPRO against the Klan; and, on August 24, 1976, the president of the plaintiff corporation received a letter from the Department of Justice informing him that he may have been affected by COINTELPRO. These facts should have put the Klan on notice that it was a COINTELPRO target.

**7.** The press release stated that COINTELPRO's activities involving White Hate groups included, for example, sending anonymous or fictitious materials to members or groups designed to create dissension and cause disruption within the groups; leaking non-public information to media sources, especially investigative material, for the purpose of exposing the nature, aims and membership of the various groups; use of informants to disrupt a group's activities by sowing dissension and exploiting disputes; *informing employers, credit bureaus, and creditors of members' activities in order to adversely affect their employment status or credit standing;* informing or contacting businesses or persons with whom members had economic dealings of members' activities for the purpose of adversely affecting their economic interests; interviewing or contacting members for the purpose of letting them know that the FBI was aware of their activity and also in an attempt to develop them as informants; establishing sham organizations designed to send out material to disrupt the groups; informing family or others of radical or immoral activity; reproducing a group leader's signature stamp; and, obtaining tax returns of members of a group. These activities, together with those described in the Senate report, *see* text *infra,* comprise at least in general terms, the bulk of the activities challenged in the Klan's complaint.

gram was published in April, 1976, over fifteen months before this suit was filed. *Select Committee to Study Governmental Operations, Intelligence Activities and the Rights of Americans*, S.Rep. No. 94–755, 94th Cong., 2d Sess. (1976). The report catalogs COINTELPRO's operations concerning the Klan; it cites evidence of FBI involvement in, among other things, wire tapping, thefts, and break-ins directed at the Klan, and the use of Klan members' federal tax returns to discredit the organization. *Id.* at Book II, pp. 93, 105, 110 & n. 526. The Klan is chargeable with knowledge of the Senate report. *See In re Beef Industry Antitrust Litigation*, 600 F.2d at 1170 ("Plaintiffs are chargeable with knowledge of the contents of public records."). "[T]he congressional proceedings should have aroused [plaintiff's] suspicions, and its failure to investigate further at that time was not the exercise of due diligence required in order to employ the fraudulent concealment doctrine to avoid the bar of the statute of limitations." *Dayco Corp. v. Goodyear Tire & Rubber Co.*, 523 F.2d 389, 394 (6th Cir. 1975).

Third, a year and two days prior to the day this action was brought, the president of the plaintiff corporation, Robert Shelton, was notified by the Department of Justice that he may have been affected by the COINTELPRO program. Letter from Michael E. Shaheen, Jr., Counsel, U.S. Dept. Justice, Office of Professional Responsibility, hand delivered by a U.S. Marshal, to Robert Shelton on August 24, 1976.

We conclude that the Klan should have known of its potential claim against the FBI before August 26, 1976. The judgment of the district court holding that the Klan's action is time barred is, therefore,

AFFIRMED.