Marguerita DILLARD, Plaintiff,

v.

Marvin T. RUNYON, Jr, Postmaster General of the United States, Defendant.

No. 95 Civ. 4899 (MBM).

United States District Court, S.D. New York.

June 25, 1996.

Stewart W. Gold, Cravath, Swaine & Moore, New York City, for Plaintiff.

Mary Jo White, United States Attorney for the Southern District of New York, Neil M. Corwin, Assistant United States Attorney, New York City, for Defendant.

## OPINION AND ORDER

MUKASEY, District Judge.

Marguerita Dillard sues Marvin Runyon, Postmaster General of the United States Postal Service ("USPS") pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, for race and sex discrimination. Runyon moves to dismiss Dillard's complaint for lack of subject matter jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(1), or alternatively, for failure to state a claim upon which relief can be granted, pursuant to Fed. R.Civ.P. 12(b)(6). Both motions are based on Dillard's failure to exhaust her administrative remedies within the allotted time. Dillard acknowledges that she did not meet all the prerequisites to suit, but contends that the filing deadlines should be tolled based on equitable considerations. Because there is no basis to toll the deadlines, there is no waiver of sovereign immunity and defendant's 12(b)(1) motion must be granted.

### I.

The facts of this case, viewed in the light most favorable to Dillard, are as follows: Dillard began working as a Letter Sorting Machine Operator in the General Post Office in Bronx, New York in 1984. (Dillard Aff. ¶ 1) During 1993 Dillard worked in that position at that location on the night shift, from 11 p.m. to 7 a.m. (*Id.*)

On February 20, 1993 Dillard received from her supervisor, Diane Campbell, a Notice of Removal, effective March 26, 1993. (*Id.* ¶ 2) The Notice stated that Dillard was removed because she was absent without official leave ("AWOL") from February 11 to February 14, 1993. The Notice explained that Dillard's tardiness on April 5, 1989 and August 16, 1990, each of which resulted in a warning letter, were considered in reaching the removal decision. (*Id.* Ex. A) Finally, the Notice informed Dillard that "[i]f this action is overturned on appeal, back pay will be allowed, unless otherwise specified in the

appropriate award or decision, *ONLY IF YOU HAVE MADE REASONABLE EF- FORTS TO OBTAIN OTHER EMPLOY- MENT DURING THE RELEVANT NON- WORK PERIOD.* (*Id.*) (emphasis in original)

Throughout her employment at USPS, Dillard was a member of the postal employees' union. (Dillard Aff. ¶ 1) When she received the Notice of Removal, Dillard contacted her union representative, Cheryl Banner and, on Banner's advice, contested the removal through the union's grievance process. Dillard neither worked nor received a salary while the grievance proceedings were pending. (*Id.* ¶ 3) Dillard also sought counseling from the Postal Service Equal Employment Opportunity office ("EEO") in Manhattan and spoke by telephone with Victor Olmo of that office. Olmo mailed Dillard an EEO Precomplaint form, which Dillard completed and returned. Several days later Olmo informed Dillard that she had completed the form incorrectly. Dillard completed and returned another form. (*Id.* ¶ 4)

On April 10, 1993, while the union grievance proceedings were pending, Dillard's son Shalimar sustained a skull fracture and concussion. As a result, he was hospitalized for two weeks. Shalimar's injury absorbed a great deal of Dillard's time and attention then and in the following months. (*Id.* ¶ 7)

A month later, on May 4, 1993, the union grievance proceedings resulted in a Settlement Agreement under which USPS agreed to modify the removal to a "time-served suspension with no back pay." (*Id.* Ex. B) In return, Dillard agreed to serve one year of probation, during which unexcused absences could result in removal without further disciplinary proceedings. (*Id.*) Dillard also agreed not to appeal the removal and settlement to EEO or any other forum. (*Id.* ¶ 5) Presumably Dillard withdrew her complaint to the EEO, although she has not so stated.

On May 21, 1993, approximately two-and-a-half weeks after the start of Dillard's probation, Dillard received a notice, entitled "Notice of Removal of Restriction," from Campbell. (*Id.* ¶ 6 & Ex. C) That notice stated:

By notice of 2/18/93, you were advised that you were being placed on Restriction and further advised that your attendance record would be reviewed every ninety (90) days and if it reflected a substantial improvement, you would be removed from Restriction and notified in writing.

Your name has been removed from the Restriction List because of satisfactory improvement in your attendance. However, you are cautioned that your attendance will be closely watched and should your record of attendance become unsatisfactory, you will *again* be placed on the Restriction List, and be subject to disciplinary action.

(*Id.* Ex. C) Both Campbell and Dillard signed that notice. (*Id.*)

Dillard maintains that she understood that Notice of Removal of Restriction to rescind her probation under the May 4 union-negotiated Settlement Agreement, even though it made no explicit reference to that agreement, and to mean that before she "was again subject to termination for unexcused absences [she] would have to be placed on probation and given an opportunity to improve [her] performance." (*Id.* ¶ 6) Dillard does not say anything about her knowledge (or lack thereof) of the February 18, 1993 notice to which the Removal of Restriction letter explicitly referred.

In Fall 1993 Dillard caught a respiratory infection, her daughter suffered from a persistent ear infection, and her son continued to endure the effects of his head injuries. (*Id.* ¶ 7) As a result of these family problems, Dillard was absent from work on several occasions in September and October 1993. (*Id.*) Dillard repeatedly requested permission from her new supervisor, Christopher Duke, to use her accumulated annual leave to take time off to care for her children. Duke denied Dillard's requests, although she contends that he granted them for other employees. Dillard contends that Duke also refused to accept telephone calls and doctors' notes to excuse her absences, although again she contends that Duke accepted those types of excuses from other employees. Dillard states further that she told Duke about the "level of stress [she] was experiencing" and asked to be switched from the night shift to

the day shift. Once again, Duke denied Dillard's request but, according to Dillard, granted like requests for other employees. (*Id.* ¶ 8)

On November 6, 1993 Dillard received a Notice of Cancellation of a previously sent Notice of Removal from employment (as opposed to a Notice of Removal of Restriction). The Notice of Cancellation stated:

> Reference is made to the Notice of Removal issued to you on 10/22/93. Be advised the above action is hereby cancelled in lieu of the attached letter dated 11/06/93.

(*Id.* Ex. D) Attached to the November 6 Notice of Cancellation was another Notice of Removal, dated November 6, 1993. That Notice of Removal stated that Dillard's employment with USPS would terminate on December 10, 1993, because of her unexplained and unauthorized absences. The Notice cited Dillard's absences on 9/25–30, 10/2–7, 10/14–15, 10/18–21, 10/25–11/01, and charged them all to AWOL. (*Id.*) The decision to remove also was based on Dillard's frequent tardiness and absence in 1989–92. (*Id.*) Like the Notice of Removal Dillard received in February 1993, the November Notice explained that if the action were overturned on appeal, "back pay will be allowed, unless otherwise specified in the appropriate award or decision, *ONLY IF YOU HAVE MADE REASONABLE EFFORTS TO OBTAIN OTHER EMPLOYMENT DURING THE RELEVANT NON–WORK PERIOD.*" (*Id.*) (emphasis in original) The Notice also informed Dillard of her right to file a grievance under the Grievance/Arbitration Procedure of her union's national agreement. (*Id.*) Both Duke and Dillard signed both November 6 notices—the Notice of Cancellation and the accompanying Notice of Removal. (*Id.*)

Dillard states that she believed that the November 6 Notice of Cancellation cancelled the attached Notice of Removal, and therefore that she would continue to work for USPS. Dillard believed that in part because she did not remember receiving the October 22 Notice to which the Notice of Cancellation explicitly referred. (*Id.* ¶ 9). Accordingly, she contends, she did not understand, and Duke did not explain, that as of December 10 she was terminated. (*Id.* ¶ 10) In light of

this belief, Dillard took no immediate action regarding the November 6 notice. (*Id.* ¶ 11)

On or about December 9, 1993 Duke told Dillard that she was required to attend the Postal Service's Employee Assistance Program ("EAP"). (Dillard Supp.Aff. ¶ 3) He told her that EAP was a program that helped USPS employees cope with problems that interfered with their work. (*Id.*) Although Dillard was skeptical about the potential value of EAP because she thought that EAP "was mainly for employees with drug- and alcohol-abuse problems," she met with her EAP representative, Fred Kittrell, the day of Duke's recommendation. (*Id.* ¶¶ 3–4) During that conversation, Kittrell told Dillard that EAP "was also designed to help people with personal or family problems which interfered with their work." (*Id.* ¶ 4) Shortly thereafter, Dillard received EAP counseling from Frederick U. Metcalf, Ph.D. (*Id.* ¶ 6) Dillard states that because Duke referred her to EAP she believed that she

> was to remain employed by the Postal Service while [she] attended EAP because it made no sense to require [her] to attend EAP if [she] was not still an employee. [She] knew of other employees who had been assigned to EAP and afterwards continued to work for the Postal Service.

(Dillard Aff. ¶ 12)

The day after Duke referred Dillard to EAP, December 10, 1993, Dillard arrived at the Post Office, but Duke refused to allow her in. He told her that if she had any questions, she should talk to her union representative. Duke did not provide Dillard with any information on EEO complaints or procedures. (*Id.* ¶ 13)

Dillard took Duke's advice and talked with her union representative, Cheryl Banner. Banner told Dillard that her only option was to challenge Duke's denial of access to the Post Office through the union's grievance process. Banner did not inform Dillard about her right to contact the EEO or about any other option for recourse. (*Id.* ¶ 14) Dillard states that at that time she still believed that she was employed by USPS. (*Id.* ¶ 17) Dillard did invoke the union's grievance process though, to contest Duke's refus-

al to allow her to work. Dillard did not return to the Bronx Post Office for work any time thereafter.

Six months later, on June 25, 1994, Dillard's December 1993 removal was reviewed at an arbitration hearing. Frank Giordano, the union's "National Business Agent" represented Dillard at that hearing (*id.* ¶ 18); Ismael Medina, a "Labor Relations Specialist" represented Duke and USPS; and Joseph S. Cannavo, Jr. served as the arbitrator. (Arb. Decision at 1, attached to compl.)

On June 30, 1994 the arbitrator ruled that Dillard's dismissal was proper. He found that USPS established that it had just cause to remove Dillard because she: (1) violated the terms of her settlement agreement, and (2) failed to call in her absences. (Arb. Decision at 4–6) Dillard claims that she realized that she had been terminated only when the arbitrator announced his decision. (Dillard Aff. ¶ 19)

Upon realizing that she had been terminated, Dillard went to the Manhattan office of the New York State Human Rights Commission ("NYSHRC") to file a complaint for discrimination. The receptionist there told Dillard that she could file a complaint only with a Postal Service EEO counselor. (*Id.*) Accordingly, on July 1, 1994, Dillard sought counseling at the Postal Service EEO office in Manhattan. She spoke to a counselor there, Ms. McDoughe, who told Dillard the EEO could not help her because she was too late—*i.e.*, she had contacted the EEO more than 45 days after her termination, in violation of EEOC regulation 29 C.F.R. § 1614.105(b) (1995). *See infra* p. 13. The counselor advised Dillard to "seek help from churches or other charitable organizations." (*Id.* ¶ 20)

Dillard then returned to NYSHRC where she was allowed to file a complaint. (*Id.* ¶ 21) A month later, in August 1994, having received no response from NYSHRC, Dillard returned to the EEO office. There, she received and subsequently completed an EEO Precomplaint Counseling form. (*Id.* ¶ 22) In November 1994, still awaiting a response from the EEO and NYSHRC, Dillard called NYSHRC. They told her they could not find her file. (*Id.* ¶ 23)

Next, Dillard came to this court and met with a clerk in the *pro se* office. He told her that to sue here, she first must file an EEO complaint and obtain a right-to-sue letter. (*Id.* ¶ 24) Accordingly, Dillard returned to the EEO office and on December 12, 1994 met with a counselor named Ms. Eghlie, who told her that she could file a complaint, as long as she justified her failure to do so within 45 days of her December 10, 1993 termination. (*Id.* ¶ 25) Dillard filed such a complaint, but has not submitted a copy of that complaint here. (*Id.*)

On May 2, 1995 USPS dismissed Dillard's complaint because of her failure to contact the EEO within 45 days of her termination. The dismissal made no mention of the existence or absence of a basis to extend the time limit, or of any argument Dillard may have made to extend that limit. USPS informed Dillard that she could appeal its decision to the EEOC within 30 days or file a complaint in federal court within 90 days. (*Id.* ¶ 26 & Ex. G) On May 8, 1995 Dillard appealed the agency's decision to the EEOC.

On June 7, 1995, Dillard, acting *pro se*, filed a complaint for Title VII relief in this court. Runyon now moves to dismiss that complaint for Dillard's failure to exhaust her administrative remedies. For purposes of this motion, Dillard is represented by counsel.

## II.

As a threshold matter it is necessary to decide whether this motion properly is characterized and resolved as one to dismiss for lack of subject matter jurisdiction, pursuant to Fed.R.Civ.P. 12(b)(1), or as one to dismiss for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6). The difference is important for both substantive and procedural reasons.

Substantively, the motions address different questions. A motion pursuant to Fed.R.Civ.P. 12(b)(1) challenges the court's power to resolve a dispute, regardless of the merits of that dispute. If a defendant moves for dismissal under Fed.R.Civ.P. 12(b)(1) and on other grounds, the court must consider

the Rule 12(b)(1) challenge first, because a finding that subject matter jurisdiction does not exist moots all other issues. *United States ex rel. Kreindler & Kreindler v. United Technologies Corp.*, 985 F.2d 1148, 1155–56 (2d Cir.), *cert. denied*, 508 U.S. 973, 113 S.Ct. 2962, 125 L.Ed.2d 663 (1993). In contrast, a motion pursuant to Fed.R.Civ.P. 12(b)(6) assumes that the court is authorized to resolve the dispute and tests whether there is a legal dispute to resolve.

■ The motions differ procedurally as well. On a motion to dismiss for lack of subject matter jurisdiction pursuant to Fed. R.Civ.P. 12(b)(1), the court may consider matters outside the pleadings, such as affidavits, documents, deposition testimony and the like. The court generally is prohibited from considering such matters on a motion to dismiss for failure to state a claim upon which relief can be granted. If the parties present and the court considers matters outside the pleadings on such a motion, the court must treat the motion as one for summary judgment pursuant to Fed.R.Civ.P. 56, and afford the parties an opportunity to present the material necessary to support or oppose that type of motion, *i.e.* materials demonstrating the absence or existence of a material fact issue, rather than the validity of plaintiff's claim assuming the facts to be true. Fed. R.Civ.P. 12(b) (1994).

■ The issue of subject-matter jurisdiction is particularly significant in suits against the United States because in such cases that issue relates to the doctrine of sovereign immunity. First principles of sovereign immunity dictate that the United States cannot be sued without its consent. *United States v. Mitchell*, 463 U.S. 206, 212, 103 S.Ct. 2961, 2965, 77 L.Ed.2d 580 (1983). The same holds true for agencies and officers of the United States. *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir.1994).

■ Congress can waive the federal government's sovereign immunity through clear and unequivocal statutory language. Congress also may impose certain conditions on its waiver of the federal government's sovereign immunity. A statute of limitations may be one such condition. *United States v.*

*Dalm*, 494 U.S. 596, 608, 110 S.Ct. 1361, 1368, 108 L.Ed.2d 548 (1990); *United States v. Mottaz*, 476 U.S. 834, 841, 106 S.Ct. 2224, 2229, 90 L.Ed.2d 841 (1986). Waivers of sovereign immunity, and their limiting conditions, must be strictly construed. *Library of Congress v. Shaw*, 478 U.S. 310, 314, 106 S.Ct. 2957, 2961, 92 L.Ed.2d 250 (1986).

■ Sovereign immunity raises a jurisdictional bar to suit. *Federal Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 474–75, 114 S.Ct. 996, 1000, 127 L.Ed.2d 308 (1994). If the government has not waived its sovereign immunity, or if the conditions under which the government has agreed to waive that immunity have not been met, federal subject matter jurisdiction does not exist. *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 769–70, 85 L.Ed. 1058 (1941); *Williams v. United States*, 947 F.2d 37, 39 (2d Cir.1991), *cert. denied*, 504 U.S. 942, 112 S.Ct. 2277, 119 L.Ed.2d 203 (1992). In other words, a claimant may not sue the government without complying with all statutory and regulatory prerequisites. *Morales v. United States*, 38 F.3d 659, 660 (2d Cir.1994); *Wyler v. United States*, 725 F.2d 156, 159 (2d Cir.1983) (failure to meet administrative requirements of the FTCA deprives court of jurisdiction); *Keene v. United States*, 700 F.2d 836, 841 (2d Cir.1983) (same).

In 1972 Congress amended Title VII of the Civil Rights Act of 1964 and waived the government's sovereign immunity for suits alleging discrimination in a government workplace on the basis of race, sex, color, religion or national origin. 42 U.S.C. § 2000e–16 (1994). Congress sought to "create an exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination." *Brown v. General Servs. Admin.*, 425 U.S. 820, 829, 96 S.Ct. 1961, 1966–67, 48 L.Ed.2d 402 (1976). *Cf. Johnson v. Railway Express Agency, Inc.*, 421 U.S. 454, 459, 95 S.Ct. 1716, 1719–20, 44 L.Ed.2d 295 (1975) (holding that Title VII does not preempt other remedies for aggrieved employees of private employers).

■ But Congress did not waive the federal government's sovereign immunity unconditionally. Government employees can

sue their employer pursuant to Title VII only if they first timely exhaust their administrative remedies, as defined by statute and regulations promulgated thereunder. 42 U.S.C. § 2000e–16(c) (1994); *Brown v. General Servs. Admin.*, 425 U.S. 820, 835, 96 S.Ct. 1961, 1969, 48 L.Ed.2d 402 (1976). A federal employee's suit after failure to avail herself of her administrative remedies, or after failure to avail herself of those remedies in a timely fashion, does not trigger the waiver of sovereign immunity and deprives a federal court of subject-matter jurisdiction to hear that employee's claim. *Johnson v. Frank,* 828 F.Supp. 1143, 1149 (S.D.N.Y.1993).

■ Exhaustion of administrative remedies requires that a federal employee comply with EEOC regulations. First, a claimant must consult a counselor at her agency's EEO office within 45 days of the alleged discriminatory act. 29 C.F.R. § 1614.105(a)(1) (1995). At this session, the EEO officer must advise the claimant in writing of her rights and responsibilities, including, *inter alia,* "administrative and court time frames." *Id.* § 1614.105(b). If, after a mandatory 30–day counseling period the matter cannot be resolved informally, the EEO officer must inform the claimant of the claimant's right to file a discrimination complaint with the agency. *Id.* § 1614.105(d). The claimant must file such a complaint within 15 days of receipt of the notice. *Id.* § 1614.106(b). The agency then is required to conduct a "complete and fair investigation of the complaint." *Id.* § 1614.106(d)(2). If the agency dismisses the complaint, the claimant may: (1) appeal that dismissal to the EEOC, or (2) file a civil action in federal district court. *Id.* § 1614.110.

When interpreting and applying these requirements, it is important to keep in mind the general purposes of Title VII and the specific purposes of Title VII's prerequisites. On the one hand, Title VII seeks to remedy discrimination in the workplace; its aims "would be defeated if aggrieved plaintiffs were absolutely barred from pursuing judicial remedies" because of an excusable failure to meet a technical requirement. *Johnson v. A1 Tech Specialties Steel Corp.,* 731 F.2d 143, 146 (2d Cir.1984). On the other hand,

[p]rocedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants ... In the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.

*Baldwin County Welcome Center v. Brown,* 466 U.S. 147, 152, 104 S.Ct. 1723, 1726, 80 L.Ed.2d 196 (1984) (citations and internal quotation marks omitted).

These principles of substantive and procedural fairness recently have been applied by the Supreme Court in *Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990). There, the Supreme Court addressed the statutory requirement that a Title VII plaintiff file her complaint within 30 days of receipt of notice of final action taken by the EEOC, 42 U.S.C. § 2000e–16(c) (1994). The Court explained that that requirement "is a condition to the waiver of sovereign immunity and thus must be strictly construed." 498 U.S. at 94, 111 S.Ct. at 456. The Court then held that a claimant against the government may benefit from equitable tolling to the same extent as may a claimant against a private party, unless Congress has legislated to the contrary. *Id.* at 95–96, 111 S.Ct. at 457 ("the same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States"). Equitable tolling of the filing requirement was sensible, the Court held, because it "amounts to little, if any, broadening of the congressional waiver" of sovereign immunity. *Id.* at 95, 111 S.Ct. at 457. Applying these principles to the facts presented, the Supreme Court concluded that the claimant could not benefit from equitable tolling. Accordingly the Court affirmed a dismissal for lack of jurisdiction.

■ Courts since *Irwin* have held that principles of equitable tolling apply not only to statutory deadlines, but also and equally to regulatory filing deadlines. *Johnson v. Runyon,* 47 F.3d 911, 917 (7th Cir.1995); *Wojik v. Postmaster General,* 814 F.Supp. 8, 8 (S.D.N.Y.1993); *see also* 29 C.F.R.

§ 1614.604(c) (1995) ("The time limits in this part are subject to waiver, estoppel and equitable tolling"). Failure to meet an administrative deadline, therefore, like a failure to meet a statutory deadline, is not fatal to a plaintiff's case if that plaintiff can establish a basis for tolling the deadline.

Dillard, the government, and several courts read *Irwin* to stand for the proposition that the statutory and administrative time limits governing a plaintiff's claim against the federal government are not jurisdictional. (Pl.Mem. at 1, 11; Def. Reply at 6 n. 5); *see, e.g., Fadem v. United States*, 52 F.3d 202, 206 (9th Cir.1994) (Quiet Title Act statute of limitations); *Johnson v. Runyon*, 47 F.3d 911, 917 (7th Cir.1995) (EEOC 45-day deadline); *Krueger v. Saiki*, 19 F.3d 1285, 1286 (8th Cir.) (Federal Tort Claims Act statute of limitations), *cert. denied*, —— U.S. ——, 115 S.Ct. 269, 130 L.Ed.2d 187 (1994); *Schmidt v. United States*, 933 F.2d 639, 640 (8th Cir.1991) (same); *Wojik v. Postmaster General*, 814 F.Supp. 8, 8 (S.D.N.Y.1993) (Title VII administrative regulation). *But see Willis v. United States*, 879 F.Supp. 889, 891–92 (C.D.Ill.1994) (holding that the statutes of limitations contained in the FTCA, although subject to equitable tolling after *Irwin*, are still jurisdictional), *aff'd* 65 F.3d 171, 1995 WL 516393 *1 (7th Cir. 1995) ("We express no opinion on whether *Irwin* transformed the statute of limitations from a jurisdictional prerequisite to an affirmative defense, because regardless, the Willises did not meet the statute of limitations."); *see also Pinder v. Levitt*, 1995 WL 329442 (S.D.N.Y. June 1, 1995) (dismissing Title VII claim against federal officer for lack of jurisdiction where plaintiff failed to meet 15–day regulatory deadline). From the proposition that the deadline is not jurisdictional, Dillard argues that defendant's motion cannot be characterized as one pursuant to Fed.R.Civ.P. 12(b)(1) and that supplemental documents may not be considered.

The courts that have held that the filing deadlines are not jurisdictional have relied on language in *Irwin* stating that equitable tolling shall be applicable to suits against the government "in the same way that it is applicable to private suits." 498 U.S. at 95, 111

S.Ct. at 457. Because the Supreme Court has held when discussing equitable tolling, that the filing deadlines are not jurisdictional in suits against private parties, *see, e.g., Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 397–98, 102 S.Ct. 1127, 1134–35, 71 L.Ed.2d 234 (1982), those courts reason that the deadlines are not jurisdictional in suits against the government. Those courts also appear to apply an unstated assumption that subject matter jurisdiction is inherently immune to the influence of equitable tolling—or, put the opposite way, a requirement that can be tolled cannot be jurisdictional, because tolling is inherently discretionary and jurisdiction inherently rigid.

But those courts, and the parties to this case, ignore that the analogy to suits against private defendants is inapposite for the simple reason that private defendants do not have the immunity of the sovereign. The Supreme Court made explicit in *Irwin* that the statutory filing deadline is a condition to the sovereign's waiver of its immunity. 498 U.S. at 94, 111 S.Ct. at 456–57. Like the waiver itself, conditions on that waiver are jurisdictional. And the filing deadlines, as the Court held in *Irwin*, also may be equitably tolled. Those two characteristics—the jurisdictional nature of the deadlines and the possibility that they may be equitably tolled—are not at all inconsistent. There is no principle or theory of which I am aware, or that either party has cited, that makes it impossible for a rule to be both jurisdictional and subject to equitable tolling. Nor is there any principle or theory that prevents a court from doing a bit of fact finding and analysis in order to determine its jurisdiction. *See generally Hyundai Merchant Marine Co. v. United States*, 159 F.R.D. 424, 426 (S.D.N.Y. 1995) (the district court has "jurisdiction to determine its own jurisdiction.") (citing *In re Martin–Trigona*, 763 F.2d 135, 138 (2d Cir. 1985)). A court may for example, review affidavits, and even hear testimony on whether the amount in controversy requirement is met in a diversity case. A court may do the same to determine the residence of one or more of the parties. Similarly, a court may evaluate the evidence properly before it to determine if there is an equitable basis to toll a filing deadline. Here it is helpful to recall

that the Supreme Court in *Irwin* affirmed both lower courts' dismissals *for lack of jurisdiction.*

■ If a claimant has not met the filing requirements, either directly or with the aid of equitable tolling, there is no waiver of sovereign immunity, and accordingly, no subject matter jurisdiction. Put differently, the government has not consented to be sued by a federal employee who has neither met with her EEO counselor within 45 days of the alleged discriminatory act, nor satisfactorily explained her failure to do so. Accordingly, defendant's motion here properly is characterized as one pursuant to Fed.R.Civ.P. 12(b)(1) to dismiss for lack of subject-matter jurisdiction.

### III.

Plaintiff here concedes that she has not satisfied the facial requirements of the regulations. She did not meet with an EEO counselor until December 12, 1994, more than a year after her December 10, 1993 termination, and well beyond the 45-day deadline. However, Dillard argues that the filing deadlines should be equitably tolled.

■ Whether a Title VII plaintiff may benefit from equitable tolling is governed by federal law, which applies equitable tolling "only sparingly." *Irwin*, 498 U.S. at 95, 111 S.Ct. at 457. Equitable tolling may be available when: (1) the claimant actively pursued her judicial remedies in the prescribed time period, (2) she was induced or tricked by her adversary's misconduct into allowing the deadline to pass, *id.*, (3) the court leads a plaintiff to believe that she has done all that is required, (4) the plaintiff has received inadequate notice, or (5) when a motion for the appointment of counsel is pending. *South v. Saab Cars USA, Inc.*, 28 F.3d 9, 11–12 (2d Cir.1994). Put simply, equitable tolling may be available when the plaintiff's failure to meet a deadline is someone else's fault. Equitable tolling is not available when the claimant herself fails to exercise due diligence. *Id.* at 12.

Plaintiff here may avail herself of additional bases of tolling. EEOC regulations provide that the agency or Commission shall extend the 45–day period in which an aggrieved person must contact the EEO office when:

> the individual shows that he or she was not notified of the time limits and was not otherwise aware of them, *that he or she did not know and reasonably should not have ... known that the discriminatory matter or personnel action occurred,* that despite due diligence he or she was prevented by circumstances beyond his or her control from contacting the counselor within the time limits, or for other reasons considered sufficient by the agency or the Commission.

29 C.F.R. § 1614.105(a)(2) (1995) (emphasis added).

Dillard relies on both common-law and regulation-based tolling. First, she contends that the statute of limitations should be tolled from December 10, 1993, the date she was refused access to the Post Office, until June 30, 1994, the date of the arbitrator's decision, because she reasonably believed that she still worked for USPS and that defendant's affirmative misconduct led her so to believe. Second, Dillard contends that the statute should be tolled from June 30, 1994 to December 12, 1994, the day she finally met with an EEO counselor, because defendant prevented her from contacting an EEO counselor who would process her claim.

Dillard contends that there are four reasons why she did not know and reasonably should not have known that she had been fired from her position at USPS, each of which she blames on USPS: (1) the May 21, 1993 Notice of Removal of Restriction, (2) the attachment of the November 6, 1993 Notice of Removal to the November 6, 1993 Notice of Cancellation, (3) her assignment to EAP, and (4) the similarity between her February and November removals.

■ Dillard explains that the May 21, 1993 Removal of Restriction suggested to her that her probation (part of the settlement of her February 1993 removal) had ended, and that she no longer could be terminated without warning. Accordingly, Dillard contends, she reasonably believed that she was not fired on December 10, 1993 because if she

were, she would have been warned about it earlier.

The May 21, 1993 Notice of Removal of Restriction explicitly refers to the removal of a restriction imposed on February 18, 1993. The May 21 notice explained that the February 18 notice placed Dillard on restriction subject to review at 90–day intervals. The May 21 notice reflected the results of that 90–day review and explained to Dillard that because her attendance had improved the restriction was lifted. Even if Dillard was completely unaware of the February 18 notice, as it appears that she was, it was only reasonable for her to inquire about that notice before concluding that the May 21 notice referred to her union settlement, an entirely different matter.

Moreover, the May 21 notice says absolutely nothing about Dillard's union-negotiated settlement that rescinded her termination and placed her on probation for a year. Dillard received the Removal of Restriction notice just two-and-a-half weeks after she was placed on probation for a full year. It makes no sense that the Postal Service would deem her improvement in that short period so remarkable as to justify lifting the penalty it imposed in place of termination. The May 21 notice was clear as to its limited purpose.

Dillard cites the attachment of the Notice of Removal to a Notice of Cancellation as another source of her confusion. She believed that the November 6 Notice of Cancellation cancelled the November 6 Notice of Removal, and that accordingly, no Notice of Removal was in effect on December 10, 1993.

The November 6, 1993 Notice of Removal also announced its purpose clearly. The attached Notice of Cancellation made explicit that it cancelled an October Notice of Removal in light of the fact that a new Notice of Removal had been issued. Dillard's claim that she was not aware of that October notice does not justify her assumption that there was no such notice, and therefore, that there was nothing for the November 6 Notice of Cancellation to cancel but the attached Notice of Removal. Again, if Dillard questioned the reference to the October Notice she should have asked her supervisor or someone else at USPS to explain the meaning of the

documents before jumping to otherwise illogical conclusions. That plaintiff subjectively believed she had not been terminated does not, in and of itself, render that belief reasonable.

■ Equitable tolling would not be warranted in this case even if the notices had been unclear. Equitable tolling redresses delay caused by the affirmative misconduct of the opposing party. It does not require the opposing party to guide a plaintiff through the complexities of litigation, but only to refrain from affirmative misconduct that works to deny a plaintiff her legal rights. The responsibility to enforce those rights is the plaintiff's. Indeed, the Second Circuit has held that the ambiguity of an EEOC notice does not "amount to affirmative misconduct on the government's part aimed at causing" a plaintiff to forgo her legal rights. *Long v. Frank,* 22 F.3d 54, 58 (2d Cir.1994) (affirming dismissal of ADEA action against Postmaster General for untimeliness), *cert. denied,* —— U.S. ——, 115 S.Ct. 938, 130 L.Ed.2d 883 (1995).

The true import of the November 6 Notice of Removal was brought into high relief by Duke's December 10 refusal to allow Dillard to report to work on that day and thereafter. It is unreasonable for an employee who has received a Notice of Removal, and who subsequently is refused access to her workplace, to think that she still works there. USPS could hardly have made the message any clearer.

Plaintiff resists this conclusion and claims that Duke's refusal to answer any of her questions on the day he prevented her from working constitutes affirmative misconduct that lulled her into inaction. However, Duke's alleged silence cannot create ambiguity when his conduct in refusing Dillard access to her workplace after she received a notice of termination was unambiguous. Dillard contends that Duke's conduct misled her for two additional reasons. First, Dillard maintains, Duke misled her by recommending that she talk to her union representative and because Dillard's union representative then informed her that her only option was to protest the action through the union griev-

ance process. Second, Duke misled Dillard, she contends, by not advising her to seek EEO counseling.

██ Duke's suggestion that Dillard talk to her union representative could amount to misconduct only if Duke's recommendation were part of a conspiracy with Banner (Dillard's union representative) to rob Dillard of her legal rights. Dillard has alleged no such thing. Duke's failure to advise plaintiff to contact the EEO also does not constitute affirmative misconduct. Dillard has not alleged that Duke did anything to prevent her from contacting the EEO if she so desired. In fact, Dillard filed an EEO complaint with respect to her February removal, which demonstrates that she was at least somewhat aware of that process.

██ Next, Dillard contends that because Duke assigned her to EAP, a program he told her helped postal "employees" deal with work-related problems, she assumed that she was still a postal employee. Dillard made this assumption in part because of what Duke said, and in part because she herself knew several people who were assigned to EAP and returned to work thereafter. (Dillard Aff. ¶ 12).

The title of that program—Employee Assistance Program—suggests, albeit mildly, that it serves current employees of USPS, and helps them resolve work-related problems and improve job performance. But it is plausible also that the program serves employees recently fired from USPS, to help remedy personal problems that may have contributed to their termination and to aid their transition to alternate employment. Indeed, it is likely that employees who have been terminated will most need the services of the EAP. Dillard bases her conclusion that EAP served only current employees on her own subjective perception of Duke's recommendation. She does not claim that EAP indeed served only current employees, or that anyone at USPS told her that to participate in EAP one must work for USPS; she claims only that she believed that to be the case. Without more, Dillard's subjective belief does not trigger equitable tolling.

Finally, Dillard contends that the similarity between her November 1993 Notice of Removal and her February 1993 Notice of Removal, which ultimately resulted in reinstatement, signalled to her that one day she would return to USPS. But Dillard's comparison of the November action to her February removal further undercuts her claim that she reasonably was unaware that she had been fired. On February 20 she was terminated by USPS. Any similarity between the November 1993 Notice of Removal and the incidents that followed and the February event could only result in the conclusion that on November 6 Dillard was terminated by USPS, effective December 10. Plaintiff's February removal ultimately was modified, she was reinstated as a USPS employee, and she may have hoped that she might be reinstated again. But her earlier reinstatement did not make it reasonable for Dillard to presume that she would be reinstated again. The May 1993 settlement did nothing to change the nature of what happened in February: it was a termination of Dillard's employment, and it had that effect until she was reinstated. Likewise, the November 6 Notice and the December 10 termination, whatever Dillard's subjective perception, was a termination that would continue to have that effect until subsequent action changed it. Dillard's belief to the contrary has no reasonable basis in the conduct of USPS, and therefore does not justify tolling the filing deadline.

## IV.

██ Dillard's complaint would be dismissed here even if defendant's motion were treated as one to dismiss pursuant to Fed. R.Civ.P. 12(b)(6). On such a motion, it is permissible to consider the complaint and any attached documents that are incorporated by reference. Fed.R.Civ.P. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); 2A James W. Moore, *Moore's Federal Practice* ¶ 10.06 (2d ed. 1995). This rule does not allow the court to adopt as true the full contents of the appended documents when their meaning is disputed, but allows the court to read an appended document "to evidence what it incontestably shows," as-

suming that an attached document is as the complaint describes it, or to conclude that the document "is what it appears to be," in the absence of a description in the complaint. *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 674 (2d Cir.1995). Review of and reliance on these supplemental documents on a motion to dismiss is permissible because their inclusion in the pleadings affords the opposing party notice and an opportunity to respond, and makes it unnecessary to convert the motion into one for summary judgment. *Cortec Inds., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991), *cert. denied,* 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992). Here, plaintiff has attached the notices she received from USPS to her *pro se* complaint. Accordingly, they may be considered.

Plaintiff's affidavits, which flesh out the allegations in her *pro se* complaint, also could be considered on a Rule 12(b)(6) motion here. Had plaintiff remained *pro se,* it would have been entirely permissible, in light of the generous construction afforded *pro se* pleadings, to consider facts presented in Dillard's affidavits, and even facts presented in a legal memorandum on a Rule 12(b)(6) motion. *See, e.g., Gil v. Mooney,* 824 F.2d 192, 195 (2d Cir.1987) (considering *pro se* plaintiff's opposition affidavit); *Lucas v. New York City,* 842 F.Supp. 101, 104 & n. 2 (S.D.N.Y. 1994) (considering *pro se* plaintiff's opposition papers).

Here, plaintiff no longer represents herself. But she has not amended her *pro se* complaint, and alone, that document fails to present the factual basis of Dillard's claim with clarity or precision. However, Dillard's affidavits, prepared with the assistance of counsel, present a detailed and elaborate story, and in effect work to amend her complaint. On a Rule 12(b)(6) motion, therefore, I could consider those affidavits together as an amended complaint and evaluate the legal sufficiency of the facts therein. Consideration of any supplemental documents submitted by defendant would be impermissible on a Rule 12(b)(6) motion, but there is no need to consider any such documents here.

The analysis on the motion to dismiss for failure to state a claim, then, would mirror the analysis discussed above. Plaintiff's complaint and the additional papers present no basis on which to toll the 45–day filing deadline.

## V.

Finally, plaintiff requests additional discovery to present further evidence of a basis for equitable tolling. (Gold Decl. ¶ 2) But the nature of plaintiff's claim makes additional discovery inappropriate. Whether Dillard was lulled into inaction by the affirmative misconduct of USPS, and whether her belief of continued employment was reasonable, depend solely on facts within Dillard's own knowledge. Any misconduct that was secret, however devious, does not trigger equitable tolling. And any facts of which plaintiff was not aware cannot convert an unreasonable belief into a reasonable one. Accordingly, plaintiff's request for further discovery is denied.

\* \* \*

For the reasons explained above, the filing deadlines will not be equitably tolled. Because plaintiff has not met those filing deadlines, the sovereign has not waived its immunity, and defendant's motion to dismiss is granted.

SO ORDERED.