Evelyn HEINRICH, Henry M. Sienkewicz, Jr., Rosemary Gualtieri, Walter Carl Van Dyke, and others similarly situated, Plaintiffs,

v.

William H. SWEET, M.D., The Estate of Lee Edward Farr, M.D., Trustee of the Lee Edward Farr Trust Dated 1/11/71, Associated Universities, Inc., Massachusetts General Hospital, Massachusetts Institute of Technology, and the United States, Defendants.

No. Civ.A. 97–12134–WGY.

United States District Court, D. Massachusetts.

April 20, 1999.

Raymond J. Heslin, Gold, Farrell & Marks, New York City, Anthony Z. Roisman, Cohen, Milstein, Hausfeld & Toll, Washington, DC, John K. McGuire, Jr., McGuire & McGuire, Worcester, MA, for Evelyn Heinrich, on behalf of her husband, George Heinrich, plaintiff.

John K. McGuire, Jr., McGuire & McGuire, Worcester, MA, Raymond J. Heslin, Anthony Z. Roisman, Cohen, Milstein, Hausfeld & Toll, Washington, DC, for Henry M. Sienkewicz, Jr., on behalf of his mother, Eileen Rose Sienkewicz, plaintiff.

Raymond J. Heslin, old, Farrell & Marks, New York City, for Rosemary Gualtieri, on behalf of her father Joseph Mayne and all others similarly situated, plaintiff.

Raymond J. Kenney, Mark Newcity, Christopher J. Maley, Martin, Magnuson, McCarthy & Kenney, Boston, MA, Gail A. Anderson, Martin, Magnuson, McCarthy & Kenney, Boston, MA, for William H. Sweet, MD, Massachusetts General Hospital, defendants.

William Shields, Sarah G. Hunt, Day, Berry & Howard, Boston, MA, Kevin T. VanWart, Jerome A. Karnick, Marc J. Zwillinger, Kirkland & Ellis, Chicago, IL, Kevin T. Van Wart, Jonathan Silverman, Kirkland & Ellis, Chicago, IL, for Lee Howard Farr, M.D., Associated Universities, Inc., defendants.

Francis C. Lynch, Lori B. Silver, Palmer & Dodge, Boston, MA, for Massachusetts Institute of Technology, defendant.

Burke M. Wong, U.S. Department of Justice, Torts Branch, Civil Division, Washington, DC, for USA, defendant.

Herbert E. Milstein, Cohen, Milstein, Hausfeld & Toll, Washington, DC, for Walter Carl Van Dyke, Representative of the Estate of Walter Carmen Van Dyke, plaintiff.

## MEMORANDUM

YOUNG, Chief Judge.

### I. *Introduction*

Evelyn Heinrich, Henry M. Sienkewicz, Jr., Rosemary Gualtieri, and Walter Carl Van Dyke [1] bring this putative class action on behalf of their decedents against Dr. William H. Sweet, the estate of Dr. Lee Edward Farr, the Trustee of the Lee Edward Farr Trust dated 1/11/71, Associated Universities, Inc., Massachusetts General Hospital, Massachusetts Institute of Technology, and the United States.[2] The gravamen of the Second Amended Complaint (the "Complaint") is that during the 1950s and 1960s, the defendants conducted boron radiation experiments on the decedents—who suffered from terminal brain cancer—with the knowledge that such experiments offered no therapeutic value to the decedents.

The United States moves to dismiss the Complaint for failure to present administrative claims to the appropriate government agency within two years of the date on which the claims accrued. *See* 28 U.S.C. § 2401(b).[3]

**1.** Walter Carl Van Dyke ("Van Dyke") does not currently assert claims against the United States because his administrative claim is still pending. *See* Comp. ¶ 1(a).

**2.** The putative class originally brought suit against the estates of former federal agents Dr. Shields Warren ("Warren") and Dr. Charles L. Dunham ("Dunham"). *See* Comp. ¶¶ 27–30. Warren and Dunham were the Atomic Energy Commission officials responsible for funding and overseeing the experiments involved in this case. *See id.* On November 18, 1996, Judge Hurley of the Eastern

### II. *Background*

The Court derives the following facts from the plaintiffs' complaint:

Evelyn Heinrich ("Mrs.Heinrich"), a resident of Massachusetts, is the executrix of the estate of her late husband, George Heinrich ("Mr.Heinrich"). *See* Comp. ¶ 7. In October 1960, Mr. Heinrich, then thirty-five years old, was admitted to Massachusetts General Hospital ("Mass General"), where doctors diagnosed him with a brain tumor. *See id.* at ¶ 8. On December 15, 1960, Dr. William H. Sweet ("Dr.Sweet"), a neurosurgeon at Mass General, performed a craniotomy on Mr. Heinrich. *See id.* During the craniotomy, Dr. Sweet twice injected Mr. Heinrich with a boron compound and then took samples from the tumor and from normal tissue. *See id.* Mrs. Heinrich alleges that Dr. Sweet injected the boron without Mr. Heinrich's consent and that the injections had no conceivable therapeutic value. *See id.* On December 24, 1960, Dr. Sweet discharged Mr. Heinrich and recommended that Mr. Heinrich return to Mass General for further treatment. *See id.* Dr. Sweet told Mrs. Heinrich that her husband had an excellent chance of recovery with Boron Neutron Capture Therapy ("BNCT"). *See id.*

Mr. Heinrich returned to Mass General on January 2, 1961 because of an infection. *See id.* ¶ 9. On January 16, 1961, Mr. Heinrich's treating physician recommended that Mr. Heinrich not undergo further operation. *See id.* Despite this recommendation, Dr. Sweet administered BNCT to

District of New York substituted the United States as a defendant in place of Warren's and Dunham's estates. *See* Def.Mem. at 2. Judge Hurley transferred this action to the District of Massachusetts on September 17, 1997. *See id.* at 2–3.

**3.** In relevant part, 28 U.S.C. § 2401(b) provides that "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues...."

Mr. Heinrich on January 18, 1961 at the Massachusetts Institute of Technology ("MIT") without the consent of Mr. Heinrich or Mrs. Heinrich. During the treatment, Dr. Sweet opened Mr. Heinrich's skull, injected him with a boron compound, and irradiated his exposed skull. *See id.* Mr. Heinrich's condition worsened after the BNCT. *See id.* On May 15, 1961, Mr. Heinrich—in a comatose state—was removed to a nursing home, where he died on May 27, 1961. *See id.* According to the Complaint, the unauthorized and nontherapeutic administration of BNCT caused Mr. Heinrich to suffer excruciating pain and ultimately killed him. *See id.*

Henry M. Sienkewicz, Jr. ("Mr.Sienkewicz"), a resident of Massachusetts, is the son of the late Eileen Rose Sienkewicz ("Mrs.Siekewicz"). *See id.* at ¶ 10. On June 10, 1960, doctors at Mass General diagnosed Mrs. Siekewicz, then thirty-nine years old, with a brain tumor. *See id.* at ¶ 11. Dr. Sweet performed surgery on Mrs. Sienkewicz to remove the tumor and recommended her for BNCT. *See id.* Mrs. Sienkewicz returned to Mass General on November 13, 1960. *See id.* She was taken to MIT on November 15, 1960 for BNCT, which was performed without the consent of Mrs. Sienkewicz or her family. *See id.* Mrs. Sienkewicz returned to Mass General four times between December 8, 1960 and September 27, 1961. She died on October 31, 1961 at Mass General after falling into a coma. *See id.* According to the Complaint, Mrs. Siekewicz died from "extensive radiation necrosis" of the brain caused by BNCT. *See id.* at ¶ 12. The BNCT also caused Mrs. Sienkewicz excruciating pain throughout the last year of her life, pain that she would not have suffered without BNCT. *See id.*

Rosemary Gualtieri ("Ms.Gualtieri"), a resident of Massachusetts, is the daughter of the late Joseph Mayne ("Mr.Mayne"). *See id.* at ¶ 13. In February 1951, Dr. Sweet diagnosed Mr. Mayne with a brain tumor and performed surgery on Mr. Mayne at Mass General. *See id.* at ¶ 14.

Dr. Sweet then transferred Mr. Mayne to Brookhaven National Laboratory ("Brookhaven"), an Upton, New York nuclear research center operated by Associated Universities, Inc. ("Associated"), and owned by the United States Atomic Energy Commission ("the Commission"). *See id.* at ¶ 1(b). Mr. Mayne was admitted to Brookhaven under the care of Dr. Lee Edward Farr ("Dr.Farr"), chairman of the medical department at Brookhaven. *See id.* at ¶ 14. Mr. Mayne underwent BNCT at Brookhaven on June 14, 1951. *See id.* Mr. Mayne left Brookhaven after his condition worsened, and died on November 3, 1951 at the Chelsea Old Soldiers Home in Chelsea, Massachusetts. *See id.*

Mrs. Heinrich, Mr. Sienkewicz, and Ms. Gualtieri allege that they first learned about the true nature of BNCT in 1995 when the President's Advisory Committee on Human Radiation Experiments ("the President's Advisory Committee") uncovered and made public documents that disclosed for the first time that (1) the experiments were conducted on unwitting patients; (2) the experiments either had no therapeutic value or were of such unlikely therapeutic value that no reasonable medical professional would conduct them; (3) the patients or their families had never been fully advised by the defendants of the true nature of the experiments or the lack of scientific or medical basis for the experiments; (4) the defendants never obtained the consent of the decedents or the plaintiffs; and (e) the people principally responsible for the misconduct are the named defendants in this case. *See id.* at ¶ 4.

Mrs. Heinrich and Mr. Sienkewicz filed administrative claims for damages with the Commission on September 29, 1995. *See* Def.Mem., Ex. A. Ms. Gualtieri filed an administrative claim on December 6, 1995. *See id.* The United States now moves to dismiss the Complaint pursuant to Rule 12(b)(1) for failure to present the administrative claims within two years of the date

on which their claims accrued. *See* 28 U.S.C. § 2401(b).

### III. *Proper Characterization of Motion*

The United States frames this motion to dismiss as one under Rule 12(b)(1) for lack of subject matter jurisdiction on the basis that compliance with 28 U.S.C. § 2401(b) is a jurisdictional prerequisite to a claim under the Act. Heinrich argues that the alleged failure to comply with the two-year statute of limitations merely provides the United States with an affirmative defense, which courts generally entertain on motions to dismiss under Fed.R.Civ.P. 12(b)(6). *See* 5A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357, at 351–52 (2d ed.1984).

■ This distinction is important for four reasons. First, a defendant can waive an affirmative defense of statute of limitations, *see National Labor Relations Bd. v. Crafts Precision Indus., Inc.*, 16 F.3d 24, 26 (1st Cir.1994), but a litigant can never waive subject matter jurisdiction, *see United States v. Horn*, 29 F.3d 754, 767 (1st Cir.1994). Second, Rule 12(b)(6) expressly permits a court to treat a motion to dismiss as one for summary judgment if it chooses to consider materials outside the pleadings. *See* Fed.R.Civ.P. 12(b)(6). Rule 12(b)(1) contains no parallel provision. *See* Fed.R.Civ.P. 12(b)(1); *Health Care Review Inc. v. Shalala*, 926 F.Supp. 274, 279–80 (D.R.I.1996). Third, a plaintiff bears the burden of proving jurisdiction on a 12(b)(1) motion, *see Viqueira v. First Bank*, 140 F.3d 12, 16 (1st Cir.1998), while the defendant bears the burden of proving an affirmative defense, *see Bowling Green, Inc. v. State Street Bank and Trust Co.*, 307 F.Supp. 648, 653 n. 4 (D.Mass.1969) (Murray, J.). Finally, a court ordinarily may not consider materials outside the pleadings on a Rule 12(b)(6) motion, *see Edwin v. Blenwood Assocs., Inc.*, 9 F.Supp.2d 70, 71–72 (D.Mass.1998), but may consider such evidence on a Rule 12(b)(1) motion, *see Jones–Booker v. United States*, 16 F.Supp.2d 52, 58 (D.Mass. 1998) (Alexander, C.M.J.).

The First Circuit has repeatedly held that compliance with 28 U.S.C. § 2401(b) is a jurisdictional requirement that cannot be waived. *See Coska v. United States*, 114 F.3d 319, 323 n. 8 (1st Cir.1997); *Kokaras v. United States*, 980 F.2d 20, 22 (1st Cir.1992); *Attallah v. United States*, 955 F.2d 776, 779 (1st Cir.1992); *Corte–Real v. United States*, 949 F.2d 484, 485–86 (1st Cir.1991); *Gonzalez–Bernal v. United States*, 907 F.2d 246, 248 (1st Cir.1990); *Lopez v. United States*, 758 F.2d 806, 809 (1st Cir.1985); *Richman v. United States*, 709 F.2d 122, 124 (1st Cir.1983).

■ Heinrich argues that the First Circuit has held that section 2401(b) is an affirmative defense rather than a jurisdictional prerequisite. In a footnote in *Oropallo v. United States*, 994 F.2d 25 (1st Cir.1993), the First Circuit cites *Schmidt v. United States*, 933 F.2d 639, 640 (8th Cir.1991), for the proposition that the "the government [has] the burden of showing that a particular limitations period may not be equitably tolled." *Oropallo*, 994 F.2d at 29 n. 4. In a parenthetical explanation, the First Circuit noted that *Schmidt* held that the government has the burden of establishing the statute of limitations as an affirmative defense in a suit under the Act. *See id.*

This Court, however, rejects Heinrich's contention that the First Circuit has "confirmed[ ] that the statute of limitations defensive is an affirmative defense for which the United States has the burden of proof." Pl.Mem. at 6. First, the *Oropallo* court did not pass judgment on the propriety of the *Schmidt* holding. Rather, the court cited *Schmidt* for the proposition that the Supreme Court has "squarely placed on the government the burden of showing that a particular limitations period may not be equitably tolled." *Oropallo*, 994 F.2d at 29 n. 4. That proposition is not relevant to this case, as Heinrich has not suggested that the equitable tolling doc-

trine applies to her claim.[4] Second, *Oropallo* actually "appears to support the contrary view that time limitations associated with waivers of sovereign immunity are jurisdictional prerequisites which may ... be subject to equitable tolling." *Willis v. United States*, 879 F.Supp. 889, 891 (C.D.Ill.1994) (refusing to endorse the order of a Magistrate Judge who cited *Oropallo* for the proposition that section 2104[b] is not jurisdictional), *aff'd* 65 F.3d 171, 1995 WL 516393 (7th Cir.1995) (table). Finally, the First Circuit has reiterated its position that section 2401(b) is a jurisdictional prerequisite at least twice since *Oropallo. See Coska*, 114 F.3d at 323; *Murray v. United States*, 81 F.3d 147, 1996 WL 145259 (1st Cir.1996) (table).

Other circuit courts agree that section 2401(b) is a jurisdictional requirement to suit under the Act. *See Flory v. United States*, 138 F.3d 157, 159 (5th Cir.1998); *De Tineo v. United States*, 137 F.3d 715, 719–720 (2d Cir.1998); *Hart v. Department of Labor*, 116 F.3d 1338, 1341 (10th Cir.1997); *Atencio–Diaz v. Bureau of Prisons*, 105 F.3d 664, 1996 WL 742362 (9th Cir.1996) (table); *Deutsch v. United States*, 67 F.3d 1080, 1091 (3d Cir.1995); *Ahmed v. United States*, 30 F.3d 514, 516 (4th Cir.1994); *Cole v. United States Sec'y of Labor*, 21 F.3d 430, 1994 WL 123903 (7th Cir.1994) (table); *Kendall v. Army Bd. for Correction of Military Records*, 996 F.2d 362, 366 (D.C.Cir.1993).

Heinrich urges this Court to follow the lead of the Eighth Circuit, which has held that the Act's statute of limitations is an affirmative defense rather than a jurisdictional prerequisite. *See Schmidt*, 933 F.2d at 640 ("*Schmidt II*"). In Schmidt's first appeal, the Eighth Circuit held that section 2401(b) was jurisdictional, and thus not subject to equitable tolling. *See Schmidt v. United States*, 901 F.2d 680, 683 (8th Cir.1990) ("*Schmidt I*"). The Supreme Court vacated *Schmidt I* without opinion, and remanded the case for further consideration in light of the recently-decided *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89, 111 S.Ct. 453, 112 L.Ed.2d 435 (1990). *See Schmidt v. United States*, 498 U.S. 1077, 111 S.Ct. 944, 112 L.Ed.2d 1033 (1991).

*Irwin* involved 42 U.S.C. § 2000e–16(c), which requires a plaintiff to file a Title VII employment discrimination claim against the federal government within thirty days of final agency action. *See Irwin*, 498 U.S. at 92, 111 S.Ct. 453. The Court granted certiorari to determine when the thirty day period begins to run and whether claims filed after the thirty day period are jurisdictionally barred. *See id.* As to the latter, the Court held only that "the same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States." *Id.* at 95–96, 111 S.Ct. 453.

Based on *Irwin*, the Eighth Circuit concluded in *Schmidt II* that if "statutes of limitations in suits against the government are subject to equitable tolling," *Irwin* necessarily implies that "strict compliance with the statute of limitations is not a jurisdictional prerequisite to suing the government" because "[i]f the statute of limitations were jurisdictional, the court would have no power to consider tolling it." *Schmidt*, 933 F.2d at 640; *accord Glarner v. United States*, 30 F.3d 697, 701 n. 4 (6th Cir.1994); *Schock v. United States*, 21 F.Supp.2d 115, 118 (D.R.I.1998).

Courts have criticized the Eighth Circuit for holding that section 2401(b) is an affirmative defense rather than a jurisdictional bar. In *Willis*, the court concluded "that the Eighth Circuit ... [has] read *Irwin* too broadly." *Willis*, 879 F.Supp. at 891. The *Willis* court rejected the Eighth Circuit's conclusion that "the effect of *Irwin* is to alter the jurisdictional stature of the time limitations applicable to the FTCA"

---

4. The doctrine of equitable tolling provides relief to a plaintiff who has actively pursued judicial remedy but filed a defective pleading, so long as the plaintiff exercised due diligence.

because "*Irwin* held only that a rebuttable presumption of equitable tolling applies to suits against the United States just as it does in suits against private defendants." *Id.*[5] More recently, the Fifth Circuit suggested that the Eighth and Sixth Circuits "may reconsider *Schmidt* and *Glarner*" because the *Irwin* rule does not apply to all suits against the government, but rather depends on an expression of Congressional intent in a particular statute. *Perez v. United States*, 167 F.3d 913, 916 (5th Cir.1999).[6]

There is good reason to reject the Eighth Circuit's conclusion that *Irwin* implies "that strict compliance with the statute of limitations is not a jurisdictional prerequisite." *Schmidt II*, 933 F.2d at 640. This Court rejects the Eighth Circuit's "unstated assumption that subject matter jurisdiction is inherently immune to the influence of equitable tolling—or, the put the opposite way, a requirement that can be tolled cannot be jurisdictional....," *Dillard v. Runyon*, 928 F.Supp. 1316, 1324 (S.D.N.Y.1996), and concludes that section 2401(b) is an element of subject matter jurisdiction, even if the equitable tolling doctrine applies to claims under the Act.[7]

■ Sovereign immunity is a jurisdictional bar to suits against the federal government. *See Federal Deposit Ins. Co. v. Meyer*, 510 U.S. 471, 475, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). Congress can only waive the federal government's sovereign immunity through clear and unequivocal statutory language. *See United States*

*v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969). The Act represents one example of Congress' clear intent to create an express waiver of sovereign immunity in certain cases. *See United States v. Kubrick*, 444 U.S. 111, 117–18, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979). Congress may also impose restrictions on waivers of sovereign immunity, such as statutes of limitations. *See id.* Section 2401(b) restricts the Act's waiver of sovereign immunity to tort claims filed within two years of the date on which the plaintiff's cause of action accrued. *See* 28 U.S.C. § 2401(b).

"[L]ike the waiver itself, conditions on that waiver are jurisdictional." *Dillard*, 928 F.Supp. at 1324; *accord United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 85 L.Ed. 1058 (1941) ("[T]he terms of the [United States'] consent to be sued in any court define that court's jurisdiction to entertain the suit."). The fact that a statute of limitations is subject to a rebuttable presumption of equitable tolling is not inconsistent with its jurisdictional nature. *See Dillard*, 928 F.Supp. at 1324. As the First Circuit noted in *Oropallo*, when a court determines whether equitable tolling applies to a statute of limitations, the "key issue is still Congressional intent...." *Oropallo*, 994 F.2d at 29 n. 4. Thus, the Eighth Circuit's assumption that a court has "no power to consider tolling" a jurisdictional limitations period is misguided. Just as courts may establish the contours

---

**5.** In fact, *Irwin* was itself a motion to dismiss for lack of subject matter jurisdiction. The district court granted the government's motion to dismiss on that basis, and the Fifth Circuit affirmed the dismissal. *See Irwin v. Veterans Administration*, 874 F.2d 1092, 1096 (5th Cir.1989). The Supreme Court in turn affirmed the Fifth Circuit's decision. *See Irwin*, 498 U.S. at 96, 111 S.Ct. 453.

**6.** Despite its disagreement with *Schmidt II*'s reading of *Irwin*, the Fifth Circuit went on to hold that equitable tolling applies to claims under the Act. *See Perez*, 167 F.3d at 919. The court declined to conclude whether its holding rendered the Act's limitations provi-

sion non-jurisdictional, but implied that equitable tolling could not apply to a jurisdictional provision. *See id.* at 915. For reasons stated below, this Court respectfully disagrees with the Fifth Circuit's conclusion that equitable tolling and the jurisdictional nature of a limitations provision are mutually exclusive.

**7.** District courts in the First Circuit have held that claims under the Act are subject to equitable tolling in certain circumstances. *See Bartus v. United States*, 930 F.Supp. 679, 682 (D.Mass.1996) (Ponsor, J.); *Cogburn v. United States*, 717 F.Supp. 958, 962 (D.Mass.1989) (Tauro, J.).

of subject matter jurisdiction by discerning whether Congress has clearly and unequivocally waived sovereign immunity in a given statute, so too may courts determine whether Congress has clearly limited that waiver to claims filed within a certain period.

To recapitulate, the First Circuit clearly adheres to the position that section 2401 is a jurisdictional prerequisite. An overwhelming majority of Courts of Appeals agree with this position. The reasoning of the few courts holding that section 2401 is an affirmative defense rather than a jurisdictional requirement is not consistent with the doctrine of sovereign immunity. Accordingly, this Court holds that compliance with section 2401(b) is a required element of this Court's subject matter jurisdiction, and consequently, that the United States has properly characterized its motion as one under Rule 12(b)(1).

### IV. *Motion to Dismiss Standard*

 In passing on a motion to dismiss for lack of subject matter jurisdiction, a district court "must construe the complaint liberally, treating all well-pleaded facts as true and drawing all reasonable inferences in favor of the plaintiffs." *Viqueira*, 140 F.3d at 16. A district court, however, has "very broad discretion in determining the manner in which in which it will consider the issue of jurisdiction." *Valedon Martinez v. Hospital Presbiteriano de la Comunidad, Inc.*, 806 F.2d 1128, 1132 (1st Cir.1986). Accordingly, in deciding a motion to dismiss, a district court may (1) consider evidence submitted by the parties, such as depositions and exhibits; (2) entertain arguments not raised by the parties' memoranda; and (3) resolve factual disputes, if necessary. *See Jones–*

*Booker*, 16 F.Supp.2d at 58 (citations omitted).

### V. *Analysis*

 The general rule is that a claim under the Act accrues at the time of injury. *See, e.g., Attallah*, 955 F.2d at 779.[8] In certain cases, however, the claim may accrue at a later date. For instance, in medical malpractice cases, a claim accrues when the plaintiff discovers the "critical facts" of his or her injury and its cause. *Kubrick*, 444 U.S. at 122, 100 S.Ct. 352. The rationale for the "discovery rule" is to protect plaintiffs who are blamelessly unaware of their claim either because the injury is latent or because the facts establishing a causal link between the injury and its cause are undiscoverable. *See id.* at 121 n. 7, 100 S.Ct. 352. Courts have extended the "discovery" rule from the medical malpractice realm to wrongful death cases. *See Diaz v. United States*, 165 F.3d 1337, 1340 (11th Cir.1999); *McGowan v. University of Scranton*, 759 F.2d 287, 297 (3d Cir.1985); *Drazan v. United States*, 762 F.2d 56, 59 (7th Cir. 1985); *In re Swine Flu Prods. Liab. Litig.*, 764 F.2d 637, 639–40 (9th Cir.1985); *Barrett v. United States*, 689 F.2d 324, 328 (2d Cir.1982).[9]

 Moreover, when death occurs from both a natural cause and alleged government misconduct, the statute of limitations begins to run when the plaintiff knows, or with reasonable diligence should have known, the government-related cause of death. In *Drazan*, a widow brought a wrongful death claim under the Act alleging that her husband, who suffered from lung cancer, died because a veteran's hospital failed to follow-up the abnormal results of an x-ray. *See Drazan*, 762 F.2d at

---

**8.** The determination of when a claim accrues under the Act is a question of federal law. *See, e.g., Santana v. United States*, 693 F.Supp. 1309, 1312 n. 2 (D.P.R.1988).

**9.** The First Circuit has applied the discovery rule outside the medical malpractice arena. *See Attallah*, 955 F.2d at 780 (applying the

discovery rule to a case in which the plaintiffs alleged that customs officials had murdered their courier and stolen the money he was carrying). More recently, a federal district court in this Circuit held that the discovery rule applies to conversion claims brought under the Act. *See Schock*, 21 F.Supp.2d at 119.

57. Because the widow thought her husband died of lung cancer alone, the Seventh Circuit tolled the statute of limitations until she knew, or should have known, that a second, government-induced cause of injury may have been involved. *See id.* at 59 ("When there are two causes of an injury, and only one is the government, the knowledge that is required to set the statute or limitations running is knowledge of the government cause, not just of the other cause."); *see also Diaz,* 165 F.3d at 1340 (quoting *Drazan,* 762 F.2d at 59); *Thompson v. United States,* 642 F.Supp. 762, 768 (N.D.Ill.1986) ("[W]here the plausible explanation [for death] is one of purely natural causes (such as lupus), there is initially no reasonable basis for supposing [misconduct]. It is not the purpose of the discovery rule to encourage or reward simple paranoia.").

Like the widow in *Drazan,* the three plaintiffs here assumed their relatives died of a natural cause: brain cancer. Applying the discovery rule, the precise issue for resolution is when each of the plaintiffs knew, or with reasonable diligence should have known, that the Commission's experiment facilitated death or otherwise caused tortious injury. *See Drazan,* 762 F.2d at 59. The plaintiffs argue that they could not reasonably have known about the connection between the injury and BNCT until 1995, when the President's Advisory Committee disclosed the facts about the BNCT experiments. *See* Comp. ¶¶ 4, 78. The United States contends that the claim accrued on the date of death, or, even if the claim did not accrue on the date of death, each of the plaintiffs should have known about the possible link between the deaths and the BNCT experiments more than two years before the administrative claims were filed.

In the 1960s, Dr. Sweet and other physicians wrote articles and reports about the failure of the BNCT experiments. *See id.* at ¶¶ 44, 45. These articles and reports indicated that the experiments failed because of inadequate scientific evidence regarding the nature of boron distribution in the human body, inadequate scientific evidence regarding boron chemistry, inadequate scientific evidence regarding the proper shape of a neutron beam for BNCT, and the absence of requisite dosimetric equipment to measure radiation. *See id.* Furthermore, on September 16, 1982, Dr. Victor Bond ("Dr.Bond"), Dr. Farr's successor as head of the medical department at Brookhaven, stated in an interview that:

> The early experience was very unfortunate. . . . Then they went beyond that. It wasn't stopped until long after it became evident it wasn't working—that's the criticism of it. Damage was done to patients just as damage was done with the first external fast neutron radiations, because radiobiology wasn't that well understood.

*Id.* at ¶ 46.

These medical reports and Dr. Bond's comments do not establish that these three plaintiffs knew or should have known about the connection between the BNCT experiments and their relatives' deaths. In *Orlikow v. United States,* 682 F.Supp. 77 (D.D.C.1988), a group of plaintiffs sued the government for injuries allegedly sustained in a federally-funded, experimental psychiatric treatment program between 1957 and 1960. *See id.* at 79. The government argued that the plaintiffs' claims were barred because they had not filed administrative claims within two years of the publication of various sources that put them on constructive notice of the causal link between the experiments and their alleged injury. *See id.* at 83. These sources included the book *The Search for the Manchurian Candidate,* as well as several television programs and newspaper articles available in the plaintiffs' community. *See id.* at 83 & n. 7. The court rejected the government's argument because "[n]ewspaper articles containing allegations do not necessarily place citizens on notice when there is no evidence that these articles were read." *Id.* at 85.

In *Stoleson v. United States*, 629 F.2d 1265, 1270 (7th Cir.1980), the Seventh Circuit rejected the government's contention that the statute of limitations began to run when the plaintiff read a union newspaper article suggesting a possible link between cardiovascular problems and exposure to nitroglycerin. Likewise, in *Thompson*, 642 F.Supp. at 767, the court held the limitations period continued to toll even though the plaintiff began to wonder about the adequacy of his wife's medical care after reading some materials on lupus.

While the plaintiffs concede the existence of such materials, *see* Comp. ¶¶ 44–46, there is no evidence that they knew about them before 1995. *See Orlikow*, 682 F.Supp. at 85 (holding that articles do not necessarily place plaintiffs on notice when there is no evidence that the plaintiffs read the articles). Furthermore, the standard of diligence required under the discovery rule is one of reasonableness. *See Attallah*, 955 F.2d at 780. This Court concludes that reasonable diligence does not require plaintiffs to scour medical journals such as *The Journal of Neuropathology and Experimental Neurology* or *The American Journal of Roentgenology: Radium Therapy and Nuclear Medicine* after their loved ones die of terminal brain cancer. *See Schock*, 21 F.Supp.2d at 119; *Orlikow*, 682 F.Supp. at 85 (concluding that reasonable diligence did not include discovery of newspaper articles, a book, and television programs available in the plaintiffs' community); *Thompson*, 642 F.Supp. at 768 ("It is not the purpose of the discovery rule to encourage or reward simple paranoia.").

More problematic for these three plaintiffs is that in 1986, the United States House of Representatives Subcommittee on Energy Conservation and Power prepared a. report called "American Nuclear Guinea Pigs: Three Decades of Radiation Experiments on U.S. Citizens" ("the Markey Report"). *See* Def. Mem., Ex. F. The Markey report revealed the Commission's "frequent and systematic use of human subjects as guinea pigs for radiation experiments" between the 1940s and the 1970s "which provided little or no medical benefit to the subjects." *Id.* The Markey Report specifically mentioned that Mass General conducted experiments between 1953 and 1957. *See id.* The *Boston Globe* described the results of the Markey Report on October 25, 1986. *See id.* at Ex. S.

■■■ This Court concludes, however, that these three plaintiffs' claims did not accrue when the Markey Report was published. The Markey Report states that Mass General conducted experiments between 1953 and 1957. *See id.* at Ex. F. Mr. Heinrich and Mrs. Sienkewicz were not treated at Mass General until 1960. *See* Comp. ¶¶ 8, 11. Mr. Mayne died in 1951. *See id.* at ¶ 14. Thus, the plaintiffs' decedents were not treated at Mass General during the years specified in the Markey Report. Furthermore, "the discovery rule does not require every potential claimant to examine every document that he or she has the legal power to examine." *Schock*, 21 F.Supp.2d at 119; *accord Orlikow*, 682 F.Supp. at 85.

In *Kronisch v. United States*, 150 F.3d 112, 116 (2d Cir.1998), the executrix of the estate of Stanley Glickman ("Glickman") brought suit under the Act alleging that Glickman had been an unwitting participant in a CIA-funded experiment in the 1950s. In 1975, the Select Committee to Study Governmental Operations with Respect to Intelligence Activities ("the Church Committee") held hearings to investigate the CIA's testing and use of chemical and biological agents. *See id.* The Church Committee's final report, published in 1976, stated that during late 1940s and early 1950s, "substantial programs for the testing and use of chemical and biological agents—including projects involving the surreptitious administration of LSD to unwitting nonvolunteer subjects ... were conceived, and implemented. These programs resulted in substantial violations of the rights of individuals within the United States." *Id.* at 117.

Glickman filed an administrative claim on December 22, 1981. *See id.* The record indicated, however, that Glickman had watched the hearings before the Subcommittee on Health and Scientific Research of the Senate Committee on Human Resources ("the Kennedy Committee Hearings") in 1977, and that after watching the Kennedy Committee Hearings, he realized that he had been a victim of CIA experiments in 1952. *See id.* at 121. In response to the hearings, Glickman made a Freedom of Information Act request to the CIA for any documents under his name because he believed that he had been part of the LSD tests. *See id.* Glickman also wrote letters to Senator Kennedy on October 11, 1977 and on January 28, 1978 urging him to identify the victims of the experiments. *See id.* at 121–22.

Taking these facts into account, the court held that Glickman's claim accrued no later than January 28, 1978, the date of his second letter to Senator Kennedy. *See id.* at 122. The court did not, however, imply that the Church Committee Report had any bearing on when the statute of limitations on Glickman's cause of action began to run. Rather, it was not until Glickman saw the Kennedy Committee hearings, requested documents from the CIA, and wrote two letters to Senator Kennedy that the statute of limitations began to run. Moreover, Glickman admitted that he first realized his participation in the study as early as 1977. *See id.* at 121.

 Construing the Complaint liberally, treating all well-pleaded facts as true, and drawing all reasonable inferences in favor of the plaintiffs, *see Viqueira,* 140 F.3d at 16, there is no evidence that any of these three plaintiffs read the Markey Report. Nor is there evidence that they had even a mere hunch or suspicion of government wrongdoing, which would have triggered the duty to investigate diligently a potential claim. *See Kronisch,* 150 F.3d at 122. These three plaintiffs had no reason to doubt that the decedents died of termi-

nal brain cancer or that they received humane, therapeutic treatment until 1995, when the President's Advisory Committee published its findings. *See* Comp. ¶¶ 4, 78. The President's Advisory Committee supplied these plaintiffs with the "critical facts" of injury and causation that set the two-year statute of limitations in motion. *Kubrick,* 444 U.S. at 122, 100 S.Ct. 352.

The United States relies on *Sexton v. United States,* 832 F.2d 629 (D.C.Cir.1987), and *Cragin v. United States,* 684 F.Supp. 746 (D.Me.1988) to support the contention that plaintiffs' claim accrued on the date of death or shortly thereafter. In those cases, however, the plaintiffs possessed far more knowledge about the injury and its cause than did these three plaintiffs before the Advisory Committee's 1995 report. *See Sexton,* 832 F.2d at 631 n. 2, 632 n. 3 (parents educated themselves about leukemia and its possible treatments before their child's death, learned about leukemia and the dangers of radiation from newspaper articles and television shows immediately after the death, and read a copy of a report criticizing the treatment their child received more than two years before they filed their claim); *Cragin,* 684 F.Supp. at 756 (statute of limitations began to run when parents asked a doctor whether a vaccination administered by military doctors could have caused their daughter's meningitis). The record in this case simply does not support the claimants' knowledge of critical facts at such an early stage.

Accordingly, this Court holds that Mrs. Heinrich's and Mr. Sienkewicz's claims, filed on September 29, 1995, and Ms. Gualtieri's claim, filed on December 6, 1995, were properly filed with the Commission within the two year statute of limitations prescribed by 28 U.S.C. § 2401(b).

## VI. *Conclusion*

For the foregoing reasons, this Court DENIED the United States' motion to

dismiss for lack of subject matter jurisdiction on March 29, 1999.