Patricia DONAHUE, individually and as Administratrix of the Estate of Michael J. Donahue Michael T. Donahue, Shawn Donahue, and Thomas Donahue, Plaintiffs,

v.

FEDERAL BUREAU OF INVESTIGATION, John J. Connolly, Jr., John M. Morris, Lawrence Sarhatt, Robert Fitzpatrick, and the United States of America, Defendants.

No. CIV.A.01–10433–RCL.

United States District Court, D. Massachusetts.

May 22, 2002.

Edward T. Hinchey, Sloane & Walsh, Robert A. George, Robert A. George, PC, Christopher Meier, Sloane and Walsh, LLP, Boston, MA, for Plaintiffs.

Richard Montague, Department of Justice, Torts Branch, Civil Division, Ben Franklin Station, Washington, DC, E.P. Mullane, Cambridge, MA, A. Douglas Matthews, Fall River, MA, Peter Schlossman, Margaret Krawiec, U.S. Department of Justice, Torts Branch, Civil Division, Washington, DC, for Defendants.

John R. Morris, Niceville, FL, Pro se.

## MEMORANDUM AND ORDER ON FBI'S AND UNITED STATES' MOTIONS TO DISMISS

LINDSAY, District Judge.

### I. Introduction

This is a suit brought by the family and estate (collectively, the "Donahues") of Michael J. Donahue ("Michael Donahue" or "Donahue") against the Federal Bureau of Investigation ("FBI"), the United States of America ("USA"), and four former FBI agents, John J. Connolly, Jr. ("Connolly"), John M. Morris ("Morris"), Lawrence Sarhatt ("Sarhatt"), and Robert Fitzpatrick ("Fitzpatrick"). The Donahues allege that the defendants are liable under various causes of action for the 1982 murder of Michael Donahue. The FBI has filed a motion to dismiss counts 3 and 7, which allege violations by the FBI of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68, and the Constitution of the United States, respectively. The USA has filed a motion to dismiss counts 8 and 9, brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–80.

### II. Background

The allegations summarized below are derived from the Amended Complaint.[1] For the purposes of these motions, the court must treat all well-pleaded facts, and all reasonable inferences therefrom, as true. *See Martin v. Applied Cellular Technology, Inc.,* 284 F.3d 1, 6 (1st Cir. 2002) (motion to dismiss for failure to state a claim); *Valentin v. Hospital Bella Vista,* 254 F.3d 358, 363 (1st Cir.2001) (motion to dismiss for lack of subject matter jurisdiction).

---

1. The Donahues derive many of their factual allegations from Judge Wolf's findings of fact in *United States v. Salemme,* 91 F.Supp.2d 141 (D.Mass.1999), *rev'd in part by United States v. Flemmi,* 225 F.3d 78 (1st Cir.2000), *cert. denied,* 531 U.S. 1170, 121 S.Ct. 1137, 148 L.Ed.2d 1002 (2001).

The plaintiffs are Patricia Donahue, both individually as Michael Donahue's widow and as the administratrix of his estate, Am. Compl. ¶¶ 1–3; and Michael T. Donahue, Shawn Donahue, and Thomas Donahue, Michael Donahue's sons, *Id.* ¶¶ 4–6.

The Donahues allege that Michael Donahue was murdered by one James J. Bulger ("Bulger") (presently a fugitive) and others on May 11, 1982. *Id.* ¶ 41. That day, Donahue offered a ride home to his neighbor Edward Brian Halloran ("Halloran"), and the two were shot while they sat in Donahue's car. *Id.* Halloran was associated in criminal activities with Bulger and one Stephen Flemmi ("Flemmi"). *Id.* ¶ 26. In January, 1982, Halloran approached the FBI and offered to cooperate in the investigation of the murder of one Roger Wheeler ("Wheeler"). *Id.* ¶ 27. Halloran told the FBI that Bulger and Flemmi had asked him to murder Wheeler, *id.* ¶ 30, and that Bulger and Flemmi had subsequently, without Halloran's involvement, caused Wheeler to be murdered. *Id.* ¶ 31.

At the time of the Halloran and Donahue murders, Bulger and Flemmi were confidential informants for the FBI, and Connolly was their "handler." *Id.* ¶ 21. Morris was Connolly's supervisor on the Organized Crime Squad. *Id.* The plaintiffs allege that Connolly and Morris were accepting bribes from Bulger and Flemmi and were providing them with confidential information about ongoing investigations. *Id.* ¶¶ 22–23. The Donahues further allege that Sarhatt and Fitzpatrick, Morris's supervisors, demonstrated a knowing or reckless indifference to Connolly's and Morris's pattern of unlawful conduct. *Id.* ¶ 25.

When one of the FBI agents who was interviewing Halloran asked Morris about Halloran's reliability as a potential witness, Morris told the agent that Halloran was untrustworthy and unstable. *Id.* ¶ 32, 35.

Morris then told Connolly that Halloran had implicated Bulger and Flemmi in the Wheeler homicide, knowing that Connolly would tell Bulger and that Bulger would retaliate against Halloran. *Id.* ¶¶ 36–37. Connolly, who also knew that Bulger would retaliate, then told Bulger of Halloran's cooperation and claims. *Id.* ¶ 38.

Nevertheless, "[i]n early May 1982, the FBI denied Halloran's request to be placed in the Witness Protection Program and told him that his relationship with the FBI was terminated." *Id.* ¶ 39 (quoting *Salemme*, 91 F.Supp.2d at 209). Shortly thereafter, Halloran and Donahue were killed.

After the murder, Patricia Donahue contacted the Boston office of the FBI to ask for information related to her husband's death. *Id.* ¶ 107. Upon this and every subsequent request, the FBI falsely responded that it had no information. *Id.* ¶ 108. The Donahues state that the first conclusive information they received about Michael Donahue's death came by way of Judge Wolf's findings in *Salemme* and the subsequent indictments of Bulger for, among other things, the murder of Michael Donahue, and of Connolly for, among other things, racketeering and obstruction of justice in the events leading up to Donahue's murder and the subsequent coverup. *Id.* ¶¶ 109–12.

The Donahues allege that FBI–Boston was aware that Bulger was responsible for Michael Donahue's murder, but intentionally concealed this information. After the deaths of Halloran and Donahue, the next time that Morris asked Connolly to tip off Flemmi to an investigation, Morris cautioned that he "did not want another Halloran." *Id.* ¶ 80 (quoting *Salemme*, 91 F.Supp.2d at 210). Yet Morris never revealed what he knew to anyone else in the FBI or in the Suffolk County (Massachusetts) District Attorney's Office, which in-

vestigated and indicted one Jimmy Flynn ("Flynn") for the Halloran murder. *Id.* ¶ 84. Nor did Sarhatt or Fitzpatrick, who knew of Halloran's cooperation, pass this information on to the Suffolk County District Attorney's Office. *Id.* ¶ 85. The Donahues allege, upon information and belief, that "FBI–Boston participated in the investigation underlying the prosecution of Mr. Flynn, and efforts were taken to conceal information about Bulger and Flemmi's role in the Wheeler, Halloran and Donahue murders." *Id.* The Donahues allege that FBI–Boston concealed information and inhibited the investigation by other law enforcement agencies of Bulger and Flemmi for the murders of Wheeler and one John Callahan, *id.* ¶¶ 88–98, and that FBI–Boston effectively hid the information offered by Joseph Murray, a member of a criminal organization called the Winter Hill Gang, that implicated Bulger in the Halloran and Donahue murders, *id.* ¶¶ 99–101. Even after the United States Attorney's Office began a grand jury investigation of Bulger and Flemmi in 1992, the FBI refused to confirm that Bulger was an informant or to allow the United States Attorney's office to review Bulger's informant file until the day before Bulger and Flemmi were indicted on January 10, 1995. *Id.* ¶¶ 102–105.

The Donahues filed suit in this court on March 12, 2001. Their original complaint included counts against Connolly, Morris, Sarhatt, Fitzpatrick, and the FBI. On March 29, 2001, the Donahues filed an administrative claim under the FTCA. After six months had passed without a response from the federal government, the plaintiffs amended their complaint on October 25, 2001, to add counts 8 and 9 against the USA under the FTCA.

The FBI filed a motion to dismiss the counts against it, and the United States followed with a separate motion to dismiss the counts against it. Both of these motions are now before the court.

### III. Analysis

#### A. The FBI's Motion

The FBI has moved under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss counts 3 and 7 of the complaint, which allege violations by the FBI of RICO and the Constitution, respectively. As noted earlier, on a motion under Rule 12(b)(1) challenging this court's subject matter jurisdiction, "the court must credit the plaintiff[s'] well-pleaded factual allegations ..., draw all reasonable inferences from them in [the plaintiffs'] favor, and dispose of the challenge accordingly." *Valentin*, 254 F.3d at 363. Similarly, on a motion to dismiss for failure to state a claim under Rule 12(b)(6), I must "accept as true the well-pleaded factual allegations of the complaint, draw all reasonable inferences therefrom in the plaintiff[s'] favor and determine whether the complaint, so read, sets forth facts sufficient to justify recovery on any cognizable theory." *Martin*, 284 F.3d at 6.

#### 1. The RICO Claim

■ In count 3, the plaintiffs sue the FBI under 18 U.S.C. § 1964(c) [2] for violations of RICO, *id.* §§ 1962(b)-(d).[3] Am.

---

**2.** This provision creates civil RICO liability:

Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee....

18 U.S.C. § 1964(c).

**3.** These provisions identify activities prohibited by RICO:

(b) It shall be unlawful for any person through a pattern of racketeering activity or

Compl. ¶ 278. The plaintiffs urge that "[t]he FBI, and its subdivisions the Boston Field Office of the FBI and the Organized Crime Squad of the Boston Field Office of the FBI, are all 'persons' as defined by 18 U.S.C. § 1961(3) and for the purposes of RICO liability, in that it [sic] is an entity capable of holding a legal or beneficial interest in property." [4] *Id.* ¶ 280. The plaintiffs allege that the FBI is "directly and vicariously liable, under *respondeat superior* or otherwise, for the unlawful acts of Connolly and Morris," *id.* ¶ 288.

The FBI first argues that it is protected from suit under RICO because section 1964(c) does not demonstrate an unequivocal congressional intent to waive the federal government's sovereign immunity. The FBI also argues that federal agencies are not "chargeable," "indictable," or "punishable" for violations of particular state and federal criminal statutes, a requirement for civil RICO liability. Mem. Supp. Def. FBI's Mot. Dismiss ("FBI Mem.") at 10–11.

The language of the RICO statute is broad and open-ended. It extends liability to "any person employed by or associated with any enterprise," 18 U.S.C. § 1962(c), where "person" is defined to include "any individual or legal entity capable of holding a legal or beneficial interest in property," *id.* § 1961(3), and "enterprise" is defined as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associat-

ed in fact although not a legal entity," *id.* § 1961(4).

However, the plaintiffs cite no case that has held that a *federal* government agency may be a RICO "enterprise," much less that it may be a RICO "person." It is true, as the plaintiffs state, that no First Circuit or Supreme Court case has held that federal government agencies are not liable under RICO. However, those federal courts that have addressed the question have been unanimous in rejecting the liability of federal agencies. Some courts have done so by holding that RICO does not contain the requisite express and unequivocal waiver of the sovereign immunity of the United States, *see Andrade v. Chojnacki*, 934 F.Supp. 817, 831 (S.D.Texas 1996); *McMillan v. Dept. of Interior*, 907 F.Supp. 322, 326 (D.Nev.1995), *aff'd*, 87 F.3d 1320 (9th Cir.1996), *cert. denied*, 519 U.S. 1132, 117 S.Ct. 995, 136 L.Ed.2d 875 (1997), while others have held that a federal agency is not liable under RICO because the agency is not subject to state or federal criminal prosecution and therefore cannot satisfy the "racketeering activity" predicate for RICO liability, *see Brown v. Nationsbank Corp.*, 188 F.3d 579, 587 (5th Cir.1999), *McNeily v. United States*, 6 F.3d 343, 350 (5th Cir.1993), *Berger v. Pierce*, 933 F.2d 393, 397 (6th Cir. 1991).

The reasoning of these opinions is persuasive. RICO does not waive the sov-

---

through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's af-

fairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section. 18 U.S.C. § 1962.

**4.** 18 U.S.C. § 1961(3) defines a "person" for the purposes of RICO as "any individual or entity capable of holding a legal or beneficial interest in property."

ereign immunity of the United States. The definition of "person" in RICO does not explicitly mention the federal government. *See Lane v. Pena*, 518 U.S. 187, 192, 116 S.Ct. 2092, 135 L.Ed.2d 486 (1996) ("A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text and will not be implied.") (citations omitted). Moreover, the legislative history of RICO, which does indicate some intention to render *local* governmental entities liable, *see United States v. Angelilli*, 660 F.2d 23, 32–33 (2d Cir.1981) (quoting the Senate Judiciary Committee Report and the statements of individual senators), *cert. denied*, 455 U.S. 945, 102 S.Ct. 1442, 71 L.Ed.2d 657 (1982), cannot, on its own, effect a waiver of the federal government's sovereign immunity. *See Lane*, 518 U.S. at 192, 116 S.Ct. 2092 ("A statute's legislative history cannot supply a waiver that does not appear clearly in any statutory text...."). In addition, federal agencies are immune from state or federal criminal prosecution, and thus cannot satisfy the "racketeering activity" requirement for civil RICO liability, because they are not "chargeable," "indictable," or "punishable" for the offenses listed in 18 U.S.C. § 1961(1). Both of these arguments convincingly demonstrate that the FBI is not liable under RICO.

Moreover, even though neither the First Circuit nor the Supreme Court has addressed this question, it is not the sort of "novel legal question" that is inappropriately dealt with at the motion to dismiss stage, as the plaintiffs argue. *See* Pls.' Opp'n [Partial] Mot. Dismiss Def. FBI ("Pls.' Opp'n to FBI") at 5–7 (citing *Logiodice v. Trustees of Maine Central Institute*, 135 F.Supp.2d 199 (D.Me.2001)). Unlike *Logiodice*, which involved questions about Maine's idiosyncratic public education system that no court had addressed, the issue of the amenability of federal agencies to RICO suits has been dealt with by many courts. Furthermore, whereas the state action question in *Logiodice* was fact-specific, 135 F.Supp.2d at 204–05, the relevant questions here merely involve the interpretation of the statutory text of RICO.

Finally, I do not find convincing the plaintiffs' argument that count 3 (and count 7) should not be dismissed because the discovery burden on the federal government would be no greater than if only counts 8 and 9 survived. A motion to dismiss for lack of subject matter jurisdiction implicates more than discovery burdens. This court does not have the *discretion* to assert jurisdiction over a claim for which that jurisdiction does not exist.

I therefore GRANT the FBI's motion as to count 3.

### 2. The Bivens Claim

■ The plaintiffs also bring a claim for violations of the First, Fourth, and Fifth Amendments to the Constitution. *See* Am. Compl. ¶ 341. The amended complaint states that the plaintiffs bring this claim pursuant to *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), and urges that "the egregious nature of the conduct accomplished by the FBI ... merit[s] a narrow exception to the blanket rule established by *FDIC v. Meyer*, 510 U.S. 471, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994)." Am. Compl. ¶ 335 & n. 21. The FBI argues that it, as an agency of the United States, is shielded from suit by sovereign immunity, and that no precedent supports an exception to the *Meyer* rule for "egregious" conduct. FBI Mem. at 5.

The plaintiffs' *Bivens* claim fails for two reasons. First, sovereign immunity bars the claim. In *Meyer*, the Supreme Court only reached the question of whether the

FDIC was subject to a *Bivens* suit after the Court decided that the agency's sovereign immunity had been waived by a sue-and-be-sued clause in the statute that created it. *Meyer*, 510 U.S. at 483, 114 S.Ct. 996 ("[W]e hold that FSLIC's sue-and-be-sued clause waived the agency's sovereign immunity for Meyer's constitutional tort claim."). In this case, unlike *Meyer*, the FBI's sovereign immunity has not been waived. Because "[s]overeign immunity is jurisdictional in nature," *id.* at 475, 114 S.Ct. 996, the absence of an unequivocal waiver of the FBI's sovereign immunity is a sufficient ground upon which to dismiss count 7 under Rule 12(b)(1).

■ Second, even if this claim were not barred by sovereign immunity, the plaintiffs simply do not have a *Bivens* cause of action. Though the plaintiffs argue for an exception to *Meyer*, that case is directly on point, and the rule of the case is expressed in unequivocal terms. *See Meyer*, 510 U.S. at 486, 114 S.Ct. 996 ("An extension of *Bivens* to agencies of the Federal Government is not supported by the logic of *Bivens* itself. We therefore hold that Meyer had no *Bivens* cause of action for damages against FSLIC."). The First Circuit has confirmed the general applicability of this rule, *see Ruiz Rivera v. Riley*, 209 F.3d 24, 28 (1st Cir.2000) ("It is well settled that a *Bivens* action will not lie against an agency of the federal government."), and the Supreme Court has recently reaffirmed it, *see Correctional Services Corp. v. Malesko*, 534 U.S. 61, 122 S.Ct. 515, 521, 151 L.Ed.2d 456 (2001) ("[T]o allow a *Bivens* claim against federal agencies would mean the evisceration of the *Bivens* remedy, rather than its extension.") (citation and internal quotation marks omitted).

In the face of such specific direction from the Supreme Court, I am not free to create an exception to the *Meyer* rule, even in the case of "egregious conduct" on the part of an agency. Therefore, the plaintiffs' *Bivens* claim fails both because of the FBI's sovereign immunity and because *Bivens* claims are not available against federal agencies.

## B. The USA's Motion

The USA has moved under Federal Rule of Civil Procedure 12(b)(1) to dismiss counts 8 and 9 of complaint. These counts, brought under the FTCA, are for wrongful death, conscious pain and suffering, negligent and intentional infliction of emotional distress, and RICO violations.[5] The USA's motion calls into question whether the plaintiffs' allegations are sufficient to confer jurisdiction on the court. Specifically, the USA argues that the case is barred by the plaintiffs' failure to file a timely administrative claim with the FBI. USA's Brief at 13. For the purposes of this motion, the court may look beyond the complaint to affidavits or other sources of uncontested facts. *Valentin*, 254 F.3d at 363.

■ Under the FTCA, a claim is "forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues...." 28 U.S.C. § 2401(b). According to the USA, the general rule is that a claim accrues at the time of the injury, in this case the 1982 death of Michael Donahue. *Id.* at 15–18. However, even under the "discovery rule," the USA argues, plaintiffs should have known of their claim, at the latest, by April 1998, when Morris testified before Judge Wolf in the *Salemme* hearings and that

---

**5.** As the USA notes in its brief, *see* United States' Br. Supp. Mot. Dismissal ("USA's Brief") at 2 n. 1, the FTCA provides a cause of action only for claims based on state law. *See*

*Meyer*, 510 U.S. at 477–78, 114 S.Ct. 996; *Harrison v. United States*, 284 F.3d 293, 298 (1st Cir.2002). Therefore a RICO claim is not cognizable under the FTCA.

testimony was widely reported in the local press. *Id.* at 18–20.

The Donahues respond that at the time of Michael Donahue's murder, news reports indicated that the killing was gang-related. Pls.' Opp'n Mot. Dismiss Def. USA ("Pls.' Opp'n to USA") at 4. Furthermore, Patricia Donahue contacted the FBI in the years after Michael Donahue's death, and was always told that the FBI knew nothing. *Id.* In 1985, Flynn was prosecuted for Michael Donahue's murder. Although Flynn was acquitted, the Donahues "found no reason to assume that the Government prosecuted the wrong man for the murders, and certainly found no reason to scour the papers for thirteen years thereafter to learn that the Government was itself involved." *Id.* at 4–5. The Donahues state that they believed that Flynn was the murderer until friends told them of Judge Wolf's findings in *United States v. Salemme* in September 1999. *Id.* at 5. Therefore, the plaintiffs argue, their claims did not accrue until September 1999, both because their lack of knowledge before that time was reasonable and because of the government's concealment of its involvement in Michael Donahue's death. *Id.* at 15–21.

■ "[I]t is well-settled that an FTCA claim must be dismissed if a plaintiff fails to file a timely administrative claim." *Gonzalez v. United States*, 284 F.3d 281, 288 (1st Cir.2002). Compliance with this requirement is a jurisdictional prerequisite and cannot be waived. *Id.*

■ "The general rule is that a tort claim accrues at the time of the plaintiff's injury." *Id.* However, "[u]nder the well-established 'discovery rule' exception … a claim accrues when the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the factual basis for the cause of action." *Id.* The USA's first argument is that the discovery rule is inapplicable to this case, and that the plaintiffs' claims therefore accrued at Michael Donahue's death in 1982. It cites the Supreme Court's recent decision in *TRW Inc. v. Andrews*, 534 U.S. 19, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001), in which the Court stated that it had recognized a discovery rule only in cases of fraud or concealment, medical malpractice, or latent disease, *id.* at 446–47. The Supreme Court, however, has not explicitly rejected a discovery rule in the context presented by this case. Moreover, *Gonzalez*, decided by the First Circuit after *TRW Inc.* and after the completion of briefing in this case, reaffirmed the First Circuit's earlier holding that in this circuit the discovery rule is not limited to those situations spelled out by the Supreme Court. Instead, the First Circuit applies the discovery rule whenever "[t]he factual basis for a cause of action is inherently unknowable," meaning when "it is incapable of detection through the exercise of reasonable diligence." *Gonzalez*, 284 F.3d at 288–89 (internal quotation marks and citation omitted); *see also Heinrich v. Sweet*, 44 F.Supp.2d 408, 415 (D.Mass.1999) ("Courts have extended the 'discovery rule' from the medical malpractice realm to wrongful death cases.").

Given the First Circuit's recent decision in *Gonzalez*, the plaintiffs are on sound ground when they argue that this case is appropriate for application of the discovery rule, even though it is not a medical malpractice or latent disease case. (Indeed, the plaintiffs also have a strong argument that even under the Supreme Court's standard, this case involves fraud or concealment.)

The next question is therefore whether the plaintiffs satisfy the requirements of the discovery rule. In this regard, the main issue is whether "in the exercise of reasonable diligence" the plaintiffs "should

have discovered the factual basis" for their claims in April 1998, when Morris testified in the *Salemme* hearings and the local media reported on his testimony.

The cases are divided as to the significance of media reports in the discovery rule analysis. On the one hand, some cases have tolled the statute of limitations despite media reports that were relevant to the plaintiffs' claims. First, in *Heinrich*, evidence that might suggest that the plaintiffs' decedents were used as human subjects in radiation experiments was revealed in specialized scientific journals and in a House of Representatives subcommittee report that was reported upon by the *Boston Globe*. 44 F.Supp.2d at 417. Judge Young concluded that the claims did not accrue when the report was published: "the discovery rule does not require every potential claimant to examine every document that he or she has the legal power to examine." *Id.* (citation and internal quotation marks omitted). Similarly, in *Orlikow v. United States*, 682 F.Supp. 77 (D.D.C. 1988), the court denied a motion for summary judgment even though major newspapers, national television programs, and national magazines had reported on allegations of CIA brainwashing experiments of which the plaintiffs had been the victims more than two years before some of them filed their claims, *id.* at 83 n. 7, 85. The court held that it could not determine, as a matter of law, that the publications triggered the running of the statute of limitations, where it was not established that the plaintiffs had actual notice of the publications. *Id.* at 85.

On the other hand, some cases hold that media reports, in some circumstances, provide the plaintiffs with constructive notice of their claims. *United Klans of America v. McGovern*, 621 F.2d 152 (5th Cir.1980), held that the plaintiff received constructive notice of the factual basis for its claims when the Attorney General held a press conference in which he announced that the FBI had carried out counterintelligence activities against the plaintiff and that some of those activities may have been improper, *id.* at 154. The court, observing that the "press conference was attended by the three major networks, the wire services, and many of the leading newspapers in the country," held that "[w]here events receive such widespread publicity, plaintiffs may be charged with knowledge of their occurrence." *Id.* Along similar lines, *Hoskins v. United States*, No. CIV. A.00–1713, 2001 WL 175237 (E.D.La. Feb. 20, 2001), held that the plaintiff should have known of the federal government's involvement in the arrival of Formosan termites in the United States because "a simple trip to the public library ... would have revealed the link to the federal government," *id.* at * 2. Still other cases, such as *Kronisch v. United States*, 150 F.3d 112 (2d Cir.1998), and *Guccione v. United States*, 670 F.Supp. 527 (S.D.N.Y.1987), discuss constructive notice but involve situations in which the plaintiffs also had actual notice.

I hold that on the facts in this case, it was not unreasonable for the plaintiffs to have failed to discover the factual basis for their claims until after March 30, 1999. Michael Donahue was killed on May 11, 1982. Flynn was indicted for his murder in 1985. Thirteen years later, Morris testified in the *Salemme* hearings and the local media reported on his testimony.

The evidence is uncontradicted that the Donahues were unaware of these reports. Two factors in particular render the Donahues' lack of awareness not unreasonable. First, there is the considerable span of time between Michael Donahue's death and the *Salemme* hearings. In *Hoskins*, the relevant publications were available at the time the plaintiff suffered harm; in

*United Klans,* the alleged wrongful conduct of the FBI ended two years before the Attorney General revealed it at a press conference. Here, by contrast, sixteen years had passed between the death of Michael Donahue and the *Salemme* hearings. It is therefore not a failure of reasonable diligence for the plaintiffs to have been unaware of media reports on the *Salemme* hearings. Moreover, a second factor is present here that also favors tolling the limitations period: someone else (Flynn) was indicted and tried for Donahue's murder, and it was not unreasonable for the plaintiffs to have believed that Flynn committed the murder despite his acquittal.

I therefore DENY the USA's motion to dismiss counts 8 and 9, except to the extent that those counts purport to assert RICO claims. As noted earlier, *see supra* n. 5, a RICO claim is not cognizable under the FTCA. Thus the RICO claims asserted in counts 8 and 9 are dismissed.

## IV. Conclusion

For the foregoing reasons, I GRANT the FBI's motion to dismiss counts 3 and 7 and DENY the USA's motion to dismiss counts 8 and 9 (except to the extent that count 9 raises a claim based on RICO).

SO ORDERED.